Joynes, J.
These are three several appeals in the same case. The bill was filed by H. J. Hartsook, executor of Mrs. Mary W. Cabell, dec’d, against her legatees and distributees, for the purpose of obtaining the advice and direction of the court, in his administration of the estate, and especially in respect to the construction and effect of certain provisions of the will and codicils of the testatrix. The first two appeals are from the decree *782 of the District court affirming interlocutory decrees of the Circuit court. The last appeal is from the first decree of the Circuit court. The various questions arising on these appeals will now be disposed of:
I. Mrs. Cabell, after disposing, by her will and two codicils of a large amount of her property, embracing probably the greater part of it, at the close of the sécond codicil, made the following provision: “Incase of a sudden and unexpected death, I give the remainder of my property to be equally divided between my cousin Dr. Carter of Philadelphia, and my cousin Peyton Skipwith of New Orleans, one-half of which, each must hold in trust for the benefit of their children.”
• It is contended, on behalf of the next of kin, that the bequest contained in this clause is dependent on the condition of the testatrix dying suddenly and unexpectedly. It is contended, that according to the evidence, she did not die suddenly and unexpectedly, and that, therefore, nothing passed by the bequest.
In cases of this sort, the question to be determined is, whether the contingency is referred to as the reason or occasion for making the disposition, or as the condition upon which the disposition is tObeeome operative. Porter’s case, Law Rep. 2 P. & D. 22; Dobson’s case, Law Rep. 1 P. & D. 88. These were eases in which the Words of contingency had reference to the whole will; but the same principles apply when they have reference only to a particular bequest, as in the present case. In Dobson’s case, the court said, that a will will not be held to be conditional, -Unless it is clear that the testator intended that it should' operate only in a certain event; and in Porter’s case, the court said, that if the language used by the testator can, by any reasonable interpretation, be construed to mean that he referred to the contingent event as the reason for making the will, then thfe will is not conditional. In Dobson’s case, the-language was'this: -.“In case of any fatal accident *783 happening to me, being about to ‘travel by railway; I ■hereby leave all my property,” &c. The court said, that the meaning seemed to be this: “My mind is ■drawn to the consideration that all railway travelling is attended with danger, and I, therefore, think I had better make my will, will was not conditional, and it was admitted to probat, It was accordingly held, that the although the testator returned unhurt from the travel .by railway alluded to in the will. . •
Mrs. Cabell had disposed of part, and probably the greater part, of her property by her will, and the eodi.cils already made, and she evidently desired and in-fended .to dispose of the residue. The fact, no doubt, was, that she had not fully made up her mind as to the objects, or all the objects, on whom she would bestow the residue, and she seems to have apprehended, that she might be cut off by a sudden and unexpected death, •before she would be able to do so. To provide against •that contingency, she thought proper to make the disposition contained in the clause in question, which she "intended to stand, in-case she shoúld make no other. So, in like manner, in a previous codicil, she had said: :“I intend hereafter writing" another codicil, to dispose •of the rest of my property, but in case of a sudden •death, I now add to this codicil,” &c.
In putting a construction upon the ambiguous language of this clause, we may .properly take into consideration the character of the contingency referred'to. And when we do so, it seems hardly possible to'believe that the testatrix could have intended the bequests in this clause to be contingent, upon‘her happening to .meet a sudden and unexpected death.' What, is a sudden death ?” What we call the' occasion or the •cause of death, as-, a shot, or a blow,- o'r á fall, may be •sudden, but hoW'Soon must death follow, to give it the character of a “sudden death?”: And what is an'“un.expected death ?” Unexpected to whom ? Unexpected *784 for how long a time ? We may well say of a death, taking place under certain circumstances, that it was sudden and unexpected; and of a death taking place under certain other circumstances, that it was not sud-^en an<^ unexpected. But how can we draw the line ? It is plainly impossible, in the nature of things, to lay ¿own a rule for determining when a death is sudden and unexpected, and when it is not; and this must , . . .' . have been as obvious to the testatrix as it is to us. And then, what possible motive could she have had to make her bounty dependent on such a condition ? She might live many years. Could she have intended, in that event, that it should depend upon the mere manner of her death, whether her legatees should take ? Such a purpose would have been whimsical and absurd to the last degree, and inconsistent with all our experience of human motives and feelings.
"Upon the whole, it seems clear, that such expressions as those used in this clause, could not properly be construed as creating a condition, unless accompanied by other language, so clear as to admit of no other interpretation. They are not so accompanied in the present case, and without putting the slightest strain upon the language, we can understand it as designed only to express the reason, which led the testatrix to dispose of the residue at that time, and to avoid the risk of further delay.
The bequests, therefore, were absolute and not conditional, and so the Circuit court held.
II. The second codicil, containing the residuary clause just considered, is dated, at the beginning, February 28, 1861, and at the end is the date August 18, 1861. On the 27th day of November 1861, the testatrix made a sixth codicil, as follows :
“ In consequence of the state of the country, I now revoke my bequests to Dr. Carter and his children, and also to Mrs. Fanny Taylor, her daughter Miss Cor *785 nelia Taylor, and also to Miss Fanny Lewis, all of them residents of Philadelphia.” It is contended on behalf of Dr. Carter and his children, that this revocation is inoperative and void, because made under a mistake. To establish the alleged mistake, they refer to the testimony of Mr. Hartsook, who says that in a conversation with the testatrix, he suggested to her, for her consideration, that if she had given property to any of her northern friends, it might be confiscated under the sequestration act [of the Confederate States] — that she replied, that she had done so, and would revoke the bequests; and that she subsequently told him that she had revoked the bequests to her northern friends, in consequence of the state of the country. The alleged mistake is, that she supposed that these legacies, if not revoked, would or might be confiscated, whereas, it .is insisted, the sequestration act was wholly void in law; and, moreover, did not confiscate the corpus of any property, but only sequestered the profits.
The most that can be made of this evidence is, that the testatrix had been advised by the witness, as his opinion, that the legacies referred to would be liable to confiscation, and that she adopted that opinion by making the revocation. But it io laid down, that if a revocation is made dependeut upon the information received by the testator, or upon his belief or opinion, the act will be held valid, notwithstanding he may have been misinformed, or under a misapprehension. 1 Redfield on Wills 358, pl. 25. It is as if she had said, “Ihave been advised that these legacies will be liable .to confiscation, and, to avoid all risk, I revoke them.” She chose to make the revocation because she had been so advised, but she does not put it on the soundness of the advice, and the revocation cannot be set aside by showing that the advice was unsound. 1 Powell on Devises 527; Atto. Genl. v. Lloyd, 3 Atk. R. 551. Besides, it has not been shown that the testatrix was *786 un^er any mistake. The counsel admits that the profits of the legacies would have been liable to confiscation, or to sequestration, which was practically the same thing: and this may have been just what she apPreheD-ded. "W"e ought to presume so, if this was the only sort of confiscation that was lawful or usual. -^n(3- if she apprehended confiscation of the whole, it has not been shown that the apprehension was unn _ _ IOUncLGCu
But the codicil does not state any fact upon the supposition of whose existence the testatrix proceeded in making this revocation. All that she says is, that she revokes the bequests, “ in consequence of the state of the country.” What there was in the state of the country that caused her to do so, or what she thought or feared in regard to the state of the country, does not appear on the face of the will. In the cases cited by counsel, the fact which the testator assumed to exist, and the assumed existence of which induced the revocation, appeared on the face of the will. But here we are asked to go outside of the will, and to ascertain from parol evidence what were the particular views and opinions of the testatrix, so as to lay the foundation for a case of mistake. Ho case has been- found in which this has been allowed, and to allow it would violate . fundamental principles.
The Circuit court, therefore, was right in holding, that the revocation was valid and effectual.
III. The next question is, what became of the half of the residuum, the bequest of which was thus revoked ? The next of kin claim, that it passed to them as undisposed of; which was the view held by the Circuit court; while Skipwith claims, that the effect of the revocation was to make the whole residuum pass to him and his children.
The claim of Skipwith has been maintained on two grounds, one of which is, that the original bequést of *787 the residue was to a class, composed of the children of Carter and the children of Skipwith. The short answer to this is, that the bequest was not to the children of Carter and the children of Skipwith, jointly and collectively, but to the children of Carter and the children of Skipwith, as separate families, each family taking one-half; in other words, the bequest was not to one class, but to two classes.
... But the ground mainly relied upon'is, that, in consequence of the revocation, the will must be read as if the revoked bequest, and every thing relating to it, were struck out, or had never been inserted; the effect of which, it is said, will be, that the whole residuum is still disposed of, and that Skipwith and his children are the only persons to whom it is given.
It is clear that under the terms of the residuary clause, Dr. Carter and Mr. Skipwith, as trustees for their children respectively, took the residuum as tenants in common. Each took a moiety, and a moiety only. If, therefore, the words importing a bequest to the Carters, be 'considered as struck out, there will remain only a bequest of a moiety to the Skipwiths. And it is a well settled doctrine in England, that where there is a devise or bequest of a residue to several as tenants in common, and a revocation by codicil of the devise or bequest of one of the shares, that share does not fall into the residuum and pass under the will, to the other devisees or legatees, but becomes undisposed of, and goes under the law to the heir at law, in ease of real estate, and to the next of kin [distributees], in ■case of personal estate. The reason is, that each tenant in common took only his several share, by the original gift, since tenants in common do not, like joint tenants, tak e per my etper tout, and there being no new gift by the codicil of the share revoked from one of them, the others can take no greater share than they had by the original will.
*788 The leading case on this subject, is Cresswell v. Cheslyn, 2 Eden R. 123, decided by Lord Horthington in 1761, whose decision was affirmed by the House of Lords. There is a note to that case by Serjeant Hill, in which he questions the correctness of the decision upon the same ground as that mainly relied upon in the present case. That case, however, has always been followed, and its doctrine is firmly established in England. The latest ease is Sykes v. Sykes, decided at the Rolls in 1867, Law R. 4 Eq. 200 and by the Lord Chancellor on appeal in 1868, Law R. 3 Ch. App. 301. The Master of the Rolls said, that Cresswell v. Cheslyn had been considered an authority for more than one hundred years, and that he did not know a single case in which its authority had been doubted. See, also, the following cases, in which the doctrine of Cresswell v. Cheslyn was recognized and approved. Skrymsher v. Northcote, 1 Swanst. R. 566; Shaw v. McMahon, 4 Dr. & War. R. 431; Harris v. Davis, 1 Coll. R. 416; Clark v. Phillips, 21 Eng. L. & Eq. R. 122; Ramsay v. Shelmerdine, Law Rep. 1 Eq. 129. In Humphrey v. Taylor, Ambl. R. 136, cited by the counsel for Skipwith, the legatees took as joint tenants, and not as tenants in common; and that was the ground of the decision. Cresswell v. Cheslyn has likewise been approved and followed in this country. Brownell v. De Wolf, 3 Mason R. 486; Floyd v. Barker & al., 1 Paige R. 480.
IV. By the first clause of her will the testatatrix bequeathed as follows:
“ Of the ten thousand and fifty dollars which I received from my uncle Eitzhugh Carter’s estate, I give and bequeath two thousand dollars of it to Mrs. Hill Carter of Shirley, two thousand dollars of it to Mrs. Mary Cabell Irvine, two thousand dollars of it to my cousin Mrs. Eanny Young, one thousand dollars of it to my friend Miss Lucy Claiborne, one thousand dollars of it to Mrs. Margaret Brown, daughter of Mrs. *789 McClelland, one thousand and fifty dollars to my friend Mrs. Fanny Taylor of Philadelphia, and one thousand dollars of it to my cousin Miss Landonia Randolph. I give the sums mentioned above to Gen’l Cocke, in trust for the sole and separate use of the ladies, whose names are mentioned.”
It appears from the evidence, that, at the death of the husband of Mrs. Cabell, he had standing in his name $10,050 of bonds of the State of Virginia, which he had purchased with money derived from the estate of ¥m. Fitzhugh Carter; that he regarded these bonds as belonging to his wife, and they were accordingly transferred to her by his executor; that in a book kept by Mrs. Cabell, and containing a list of all her stocks and public bonds, the said bonds were entered under the head of “ State bonds transferred by J. C. Cabell’s ex’or to Mary W. Cabell, derived from ¥m. Fitzhugh Carter’s estate,” and that these bonds were kept by Mrs. Cabell, and were found after her death, wrapped up together in a separate wrapper.
It is contended, on behalf of the next of kin, that the language of this clause of the will must be construed with reference to the facts disclosed by this evidence ; and that the effect of it, when so construed, is to give specific legacies of stock, and not legacies of money, as the words, taken literally, import. And so the Circuit court held. The legatees, on the other hand, insist, that the legacies are money legacies, with s fund referred to out of which they are to be paid, though they are to be paid at all events; in other words, that they are what are called demonstrative legacies.
It is a well settled rule, that the court will incline against construing a legacy to be specific, and that a legacy will not be held to be specific, unless there appears in the will a clear intention to make it so. The. following language is used in 1 Roper on Legacies 213, *790 in reference to the class of cases in which the question is, whether a legacy of stock is general or specific. . “ The intention of the testator to bequeath specifically must not be inferred by conjecture, nor upon a term, w^c^-^s capable of a double intendment, when the form of bequest is general; for a court of equity requires the. intention -to give specifically, either to be expressed, °r c^eai’ty an<^ indisputably manifested from perusal of the whole will.” Thus, a direction to transfer stock to a legatee will not make the legacy specific,though the testator had such stock at the date of his will. For the testator may have meant a transfer of the particular stock he had at the date of the will; or that the executor should purchase stock and transfer it to the legatees. In a cáse of that sort (Sibley v. Perry, 7 Ves. R. 522), Lord Eldon held, that the legacy was not specific, though he had no doubt, in private, that the testator meant to give the stock which he had; but he said there was no ease deciding that a legacy was specific, without something making the specifie thing the very corpus.
So when the bequest is of stock, the fact that the testator possessed at the date of his will, the precise number of shares bequeathed, will not of itself make the bequest specific. Thus, in Robinson v. Addison, 2 Beav. R. 515, the testator made a bequest of five and a half shares in the Leeds and Liverpool canal, and two other bequests of five shares each; making fifteen and a half shares in all. At the date of the will, he owned just fifteen and a half of those shares. Lord Langdale held, that the bequest was not specific, and in giving judgment, said: “ In the gift, the testator has used no words of description or reference by which it appears that he meant to give the specific and particular shares which he then had.
Various arguments depending on the general scope and effect, of the will, were used for the purpose of *791 showing, that the testator in giving the precise number of shares which he possessed, must have had those shares in contemplation and none other, and consequently must have meant specific gifts of them.” * '* * * “It is, however, clear, the testator, if he had meant to give only the shares which he had, might have desigmated them as his; that the mere circumstance of the testator having, at the date of the will, a particular property of equal amount to the bequests of the like property which he has given, without designating it as the same, is not a ground upon which the court can conclude that the legacies are specific.” Davis v. Cain, 1 Ired. Eq. R. 45; and Tifft v. Porter, 4 Seld. R. 516, are cases of the same sort. See, also, 2 Wh. & Tud. L. Ca. 241.
In Kirby v. Potter, 4 Ves. R. 748, where the question was, whether the legacy was a specific legacy of stock, or a legacy of money payable out of stock, Lord Alvanley held the rule to be, that no legacy should be held to be specific unless demonstrably so intended, and he said, that “ whenever there is a legacy of a given sum, there must be positive proof that it does not mean sterling money, in order to make it specific.” In a subsequent case (Deane v. Test, 9 Ves. R. 152), Lord Eldon thought Lord Alvanley had spoken too strongly in saying that nothing less than “positive proof” of intention would be sufficient to overrule the 'prima fade construction of the words. Lord Eldon held, that where the words import a gift of money, as of a sum of money out of certain stock, the prima facie intention is to give a money legacy; a settled rule of construction to which it was wholesome to adhere, “ until driven out by strong, solid and rational interpretation, put upon plain inference drawn from the rest of the will.” He said further, that minute criticism would not vary the prima fade rule of construction. See, also, 1 Roper on Leg. 219, 220, 227, 234, 235, 240. In Walton v. *792 Walton, 7 John. Ch. R. 259, Chancellor Kent lays down the rule in these words: “ The courts are so desirous of construing the bequest to be general, that if there he the least opening to imagine, that the testator meant £jve a sum money, and referred to a particular fund only as that out of which he meant it to be paid, it shall be construed pecuniary, so that the legacy may not be defeated by the destruction of the security.”
JLn construing a will, the enquiry is, not what the testator meant to express, but what the words used by him do express; and, as was said by Sir William Grant in Attorney General v. Grote, 3 Mer. R. 316, “to authorize a departure from the words of a will, it is not enough to doubt whether they were used in the sense which they properly bear. The court ought to be quite satisfied that they were used in a different sense, and ought to be able distinctly to say, what the sense is in which they were meant to be used.” And, as was said by Lord Eldon in the same case (2 Rus. & Myl. R. 699), “individual belief ought not to govern the case; it must be judicial persuasion.” As a general rule, the question whether a legacy is general or specific, is to be determined upon the face of the will. Innes v. Johnson, 4 Ves. R. 568. And though it has been held, that where a testator has described the subject of the bequest in ambiguous terms, evidence of the state and value of the property may be received, in aid of the construction, to determine whether a legacy is general or specific; Boys v. Williams, 2 Rus. & Myl. R. 689; Attorney General v. Grote, Ib. 699; it is not admissible to alter the meaning of the words employed, when the meaning is plain, or to supply a reference to a particular subject or corpus, when none is imported by the language of the will. Parol evidence is always admissible to ascertain the thing actually described, but it is not admissible to show that the testator intended, by his will, to refer to a thing which the will does not describe. Pell v. Ball, 1 Speers’ Eq. R. 48.
*793 Applying these rules to the clause under consideration, it seems to be clear, that the bequests contained in it cannot be regarded as specific. There is no mention of stock or bonds. The subjects of the several bequests are described as so many dollars; in the latter part of the clause they are referred to as “ the sums mentioned.” In the beginning of the clause, the aggregate subject is spoken of as so many dollars, the amount being equal to the sum of all the several legacies. It is only by going out of the will that we find an argument in favor of holding the legacies to be specific; it is only by going out of the will that we find that it was stock and not money that came to the testatrix from the estate of her uncle Fitzhugh Carter. And even if we consider the evidence relied upon, it is by no means conclusive. The testatrix may have chosen to consider, that she had received ten thousand and fifty dollars in value from her uncle Fitzhugh Carter’s estate, and to give that amount, in money, to those among whom she divided what came from that source. The fact that the identical bonds derived from Fitzhugh Carter’s estate were kept by her in a separate wrapper, apart from her other bonds and stocks, indicates nothing decisive, if indeed it can be said to indicate anything at all to the purpose. The most that can be said of all this evidence is, that it affords a conjecture, that the testatrix intended by this clause to give stock and not money. But, as we have seen,,no conjecture, however strong and plausible, will be sufficient to overrule the prima fade construction of the language.
The Circuit court, therefore, ei’red in holding these legacies to be specific legacies of stock. They are money legacies, but whether general or demonstrative, it is not necessary to decide, as the estate is ample to satisfy, them, so that the question whether a special fund is appropriated to their satisfaction is unimportant.
*794 ^ ano^er clause of the will, the testatrix bequeathecl “ my guaranteed bonds of the James River and Kanawha Company,” to the unmarried daughters of Carter Braxton and Dr. Corbin Braxton. At the date of the will, she owned certain bonds of the James River and Kanawha Company, the payment of which guaranteed by the State of Virginia, which amoim'fced, in the aggregate, to $7,600. In the year 1860, an act was passed by the legislature of Virginia which provided, among other things, that such of the holders of guaranteed bonds of the James River and Kanawha Company, as should surrender them, should receive, in lieu thereof, bonds of corresponding amount of the State of Virginia. Sess. Acts 1859-60, p. , sec. 4. In pursuance of this act, Mrs. Cabell surrendered the bonds of the James River and Kanawha Company held by her, and received in lieu of them, a corresponding amount of bonds of the State, which she held at the time of her death. It is contended, on the part of the legatees in this clause, that, by the conversion of the.bonds, the legacies were adeemed, and that they are entitled to receive money to the nominal amount of the bonds, under a subsequent clause of the will; and so the Circuit court held. The clause referred to is in these words: “I have specified in several instances, exactly what different stocks is to be given to different persons, but in case changes may be made in the location of my stock, I wish it distinctly understood, that out of my general property, those same persons are to receive the sums of money specified as given to’.them.” It is contended, on behalf of those who take the residuum, that there was no ademption, and that the legatees of the guaranteed bonds are entitled to the State bonds into which they were converted, and have, therefore, no claim to receive money, under the provision referred to.
The general rule in regard to specific legacies is, that *795 the claim of the legatee will be defeated, if the thing specifically bequeathed to him is not in existence at the time of the testator’s death; in that case, the legacy is said to be adeemed. And it seems to be the better opinion, and is now the established rule in England, that ademption depends on a rule of law, and not upon the intention of the testator. 1 Roper on Leg. 329, et seq.; 2 White & Tudor Lead. Cases, notes to Ashburner v. Macguire.
The word ademption, as applied to specific legacies of stock, or of money, or of securities for money, must be considered as synonomous with extinction or annihilation. Where stock specifically bequeathed has been sold by the testator, or where a debt specifically bequeathed has been received by the testator, the subject of the bequest is extinguished or annihilated; nothing exists upon which the will can operate, and the legacy is adeemed and gone. But “ where the thing specifically given has been changed in name and form only, and is in existence, substantially the same, though in a different shape, at the time of the testator’s death, it will not be considered as adeemed by such nominal change.” This is the language of the English annotators upon Ashburner v. Macguire, 2 Wh. & Tud. 249. It may be illustrated by the following cases.
In Dingwell v. Askew, 1 Cox Eq. R. 427, stock standing in the name of trustees for the testatrix, was specifically bequeathed, and the testatrix subsequently took a transfer of the stock from the trustees into her own name. This was held not to be an ademption of the bequest. In Boper it is said, that this case is an authority, that' the transfer of a fund specifically bequeathed, into the names of new trustees, will not affect a specific bequest. And the author supposes the case of trustees authorised by deed or will to change securities, with the concurrence of A., the person who was empowered to dispose, and had disposed, by will, *796 of the fund then in stock, and they, with his consent, sold the stock specifically bequeathed, and invested the proceeds upon a mortgage; and he expresses the opinion, that, in such a case, there would be no ademp^on* -*-11 Blackwell v. Child, Ambl. R. 260, Child, the testator, who was a partner, under articles providing ^01’ a renewal of the partnership, bequeathed specifisfiare? described as nine-twelfths of the pro-, fits of the partnership. After the date of the will, the articles of partnership expired, and the partners, about a year later, entered into new articles, in which the shares were divided into twenty-four parts, fourteen of which belonged to Child. It was held by Lord Hardwicke, that though the interest of the testator was varied, there was no ademption. In Ashburner v. Macguire, 2 Bro. C. C. 108, the testator bequeathed specifically to A., for life, the interest of a bond due him, and, after the death of A., bequeathed the principal of the bond to her children. After the date of the will, the debtor became bankrupt, and the testator proved his debt under the commission, and received a dividend upon it. It was held by Lord Thurlow, that the legacy was not adeemed, except to the extent of the dividend received out of the bankrupt’s estate by the testator, and he decreed that the bond should be. delivered to the legatees. In Oakes v. Oakes, 15 Eng. L. & Eq. R. 193; S. C. 9 Hare R. 666, the testator was possessed, at the date of his will, of certain shares of the Great Western Eailway Company, which he bequeathed specifically. Subsequently these shares were, by a resolution of the company, under authority of an Act of Parliament, converted into consblidated stock. It was held by Vice Chancellor Turner, that there was no ademption. He said : “ The testator had this property at the time he made his will, and it has since been changed, in name and form only. The question is, whether a testator has, at the time of his death, the *797 same thing existing, it may be in a different shape, yet substantially the same thing.” He added, that he thought the case was stronger in favor of the construetion he adopted, because it was not shown that the testator, in any respect concurred in the conversion of the shares into stock. It will be observed, however, that this circumstance was not the ground of the decision. In Walton v. Walton, 7 John. Ch. R. 259, there was a specific bequest of thirty shares of the stock of the Bank of the United States. After the date of the will, the charter of the bank expired, and its assets were conveyed to trustess, who divided them among the stockholders, from time to time, as they were received.
The testator received dividends on his shares, but never disposed of them. It was held by Chancellor Kent, that, though the fund was varied and differently arranged, and was diminished in value by operation of law, it was not destroyed, nor its identity lost, and that there was, therefore, no ademption. In Ford v. Ford, 3 Foster R. 312, the testator, by a codicil, bequeathed to his wife all notes of hand payable to him at the date of the codicil, which was held to be a specific bequest. Afi the date of the codicil, the testator held four promissory notes signed by Samuel S. Hill and his brother. Subsequently, during the life of the testator, these notes were taken up, the brother of Samuel S. Hill was released at his own request, and four other notes, signed by Samuel S. Hill alone and secured by mortgage, were given in their stead. The court, after a discussion of numerous authorities, said: “Where the identity of the debt is not lost, where it still preserves its form substantially, as at the date of the will, where there has been no payment of it, but only a change of the security for it, there seems to be no reason for considering* it adeemed.” * * * * * “In the present case, the debt existing at the date of the codicil has not been paid by the substitution of the new notes andthemort *798 gage for the original notes. Its identity has not been. lost, and nothing has been accepted in satisfaction of it. . There was merely a change of the security and of the evidence of the debt from joint and several notes, to no*es seeure<l by mortgage.” It was accordingly held that there was no ademption. In Anthony v. Smith, Busbee Eq. R. 188, a testator bequeathed to his debtor the bond which constituted the debt. After the date .... . n - of the will, the testator, for the convenience oi other creditors of the debtor who desired a new deed of trust to be executed, took from him- a new bond, adding to the principal the interest that had accrued. The Court held, that there was no ademption. It said: “Did the subsequent transactions between the parties destroy the debt, or so change it that it could not be known to be the same? If it had been collected by the testator, there is no doubt that the debt would be lost; but, instead of being collected, it was only renewed, and renewed only because other creditors of the plaintiff desired a new deed of trust to be executed. It was the same debt, principal and interest, secured by a new note. The new security does not annihilate, but preserves the substance of the thing given, to wit, the debt. Such certainly appears to be the opinion of Lord Hardwicke when he said, in the ease of Blackwell v. Child, “I think it is a specific legacy of quantity, bequeathed out of a certain body, and if the body be subsisting at the death of the testator, the debt shall be paid out of it. It was said to be like the novation a debt, which does not destroy the legacy of the debt.” In Gardner & als v. Printup, 2 Barb. S. C. R. 83, the testator made a be_ quest which was held to be speeific, of the proceeds of bond and mortgage which he held against Briggs and Schenck. The bond was for $8,000, payable in six annual instalments, with interest. Proceedings having been commenced to collect the debt, the mortgagors ■sold part of the land embraced in the mortgage to one *799 Yost, for $5,000, of which $1,700 was paid to the testator, and the balance of $3,300 was secured by the bond of Yost and another party, executed directly to the testator, and endorsed as a payment on the mortgage. As between the testator and the mortgagors, this bond was understood to be an absolute payment of the amount of it; but the lien of the mortgage upon the part of the land bought by Yost, was not released, be- • . 1 ____ __ mg retained to secure the payment of the bond. I he court held, that the money due upon Yost’s bond passed to the specific legetee as part of the legacy.
In Stout v. Hart, 2 Halsted (Law) R. 418, the testator made a specific bequest of a bond of Peter Phillips and John Phillips, the latter being a surety. After the date of the will, at the request of John Phillips and for his accommodation, and to enable him to secure and indemnify himself as surety, the testator accepted from him a new bond, executed by John Titus as principal, and said John Phillips as surety, and gave up the old bond.
Subsequently, Peter Phillips, administrator and John Phillips, by an arrangement between them, ascertained the respective shares of the debt which Peter Phillips ■and John Phillips ought to pay. The administrators executed their bond to the testator for the share of Peter Phillips, and John Phillips and John Titus executed their bond for the share of John Phillips.
The court held, that the legacy was not adeeme d This decision was, however, made in the year 1801, and the court expressed the opinion, that ademption was wholly a question of intention, which it understood to be the settled doctrine of the English courts at that time. See, also, Doughty v. Stillwell. 1 Bradf. R. 300.
The substantial subject of the bequests in this clause, is the bonds, as evidences of debt, and not' as pieces of paper. The substance of the transaction by which the James River and Kanawha bonds *800 were converted into State bonds, was merely this, that one of the original parties, whose name was of no value, was released, and the separate obligation of the only solvent party accepted, in lieu of the obligation of both. The debt due upon the guaranteed bonds has never been paid, and so the real subject of the bequest has never been extinguished. The State bonds are only a substituted security for the same debt, and the principle is the same as if the James River and Kanawha bonds had been renewed, without the guaranty of the State, and either with or without other security. The subject is now known by another name, but it is not necessary that the subject shall continue the same in name, provided it continues the same in substance.
The result is, that the subject of the bequests in this case has, in the language quoted from White & Tudor, and by them adopted from Vice Chancellor Turner, been “ changed in name and form only, and is in existence substantially the same, though in different shape,” and that there has, therefore, been no ademption, and the legatees of the guaranteed bonds, therefore, take the State bonds which were substituted for them. The clause of the will above quoted applies to the case of such “ a change in the location of stock” as to amount to an ademption, so that, but for that clause, the legatee would get nothing.
VI. At April term 1868, the Circuit court of Kelson gave authority to the executor to invest the funds in his hands, in registered bonds of the Confederate States, or of the State of Virginia. In pursuance of this authority, the validity of which has not been controverted, he invested $47,600 in Confederate bonds, and, of course, the amount has been lost. The Circuit court held, that this loss is chargeable to the estate, so as to throw half the loss on the Skipwiths. The Skipwiths complain of this, and say, that this investment *801 was not made for them; that they were ready to receive, and did receive, what was offered to them; and that it was not their fault, that the next of kin, who were entitled to the other half of the residuum, were not forthcoming, or did not or could obtain their share.
There is no foundation for this complaint. It was not the fault of the next of kin, that they did not receive any part of the Confederate money in the hands of the executor. It was never offered to them. What remained in the hands of the executor belonged to the estate, and its loss was the loss of the estate
VJLL. Skipwith received, at different times, from the executor, in Confederate money, the sum of $73,910, on account of the half of the residuum to which he was entitled, as trustee for his children. The Circuit court held, that in the division now to be made, this sum must be charged at its actual value in the present currency, estimated at $17,289 76. The next of kin insist, that it should be charged at its full nominal amount, and} in support of this position, they allege that Skip-with is to blame for their receiving nothing, and seem to intimate that there was something like collusion between him and the executor.
If this claim should be allowed, the result would be, that the next of kin, in the division of good money now to be made, would receive $73,910 before Skip-with would receive any thing, though what Skipwith has heretofore received was only equivalent to $17,239 76 in good money. In other words, the next of kin would get $73,910 of good money, as the equivalent of Skipwith’s $73,910 of Confederate money, or $73,910 as the equivalent of $17,239 76; thus giving them, in round numbers, $56,000 more than he gets, though he is entitled to justthe same as they are. This would be gross injustice. There is no evidence of any collusion between Skipwith and the executor. Skip- *802 with received, and had a right to receive, what he could get in Confederate money, but it was no fault of his that the next of kin got nothing. They got nothing, because the names of most of them and the proportions in which they were entitled, were unknown. And there is no evidence that any of those who were known, made an effort to get a part of the Confederate money.
As to the suggestion that Skipwith may have invested the Confederate money to advantage, and realized from it more than its value in the present currency, there is nothing in the record to show that he probably did so. There was no such suggestion made, and no enquiry on the subject was asked in the Circuit court. The suggestion comes too late.
VIII. By the second clause of her will, the testatrix bequeathed to Smyth Lee, one-half the “Virginia stock” she might own at the time of her death. The Circuit court held, that this was a general or fluctuating legacy, and that it must be taken in subordination to the legacies in the first clause, which were held to be specific legacies of State stock.
It has already been held that the legacies in the first clause are money legacies and not specific legacies of stock; so that the particular ground of this decision fails. The bequest to Smyth Lee, however, is not of one-half of each State bond of which the testatrix might be possessed at her death, but of the half of the aggregate of all the bonds of which she might be then possessed. It would seem to follow, therefore, that in ascertaining what is the amount or quantity of this half we must embrace all in the computation, though part may be specifically bequeathed. But that is unimportant, for there is no specific bequest of State bonds in the will. The State bonds which were taken in place of the guaranteed bonds, pass to the specific legatees of those latter bonds. But these State bonds are thus regarded as being still, in effect, guaranteed *803 bonds. They ought not, therefore, to be counted as state bonds in computing what Smyth Lee is entitled to.
It is further insisted, on behalf of Smyth Lee, that the Circuit court erred in holding that $34,000 of State stock, which it is said had been loaned to, or deposited with, the Howardsville Bank by the testatrix, should not be embraced in computing the amount or quantity of such stock held by her at her death. This, of course, depends upon the question, whether that stock belonged to the testatrix at her death. The evidence is, that Mr. Hartsook, who was the agent of the testatrix, and cashier of the Howardsville Bank, made use of her money, with her consent, in purchasing State stock, which was transferred by the sellers to the bank, and deposited by it with the treasurer of the State to secure its circulation. This was done under an agreement with the testatrix, that the bank should pay the taxes on the stock, and pay to her the whole of the interest upon it, and that when she should require it, the bank should redeem the stock and deliver it to her, or deliver her an equal amount of like stock.
It appears from this evidence that there was no loan or deposit of stock by the testatrix. The stock was bought with her money, but it was not bought in her name, nor for her, and never belonged to her. She had, according to the terms of the contract, a right to demand from the bank an amount of stock equal to what was bought with her money, and if the bank failed to comply with this demand, she had her remedy in damages. But it was nothing more than a loan of money, with a special agreement as to the manner in which the loan should be repaid. It is clear, therefore, that the Circuit court was right in refusing to give to Smyth Lee any part of this claim against the Howardsville Bank.
The decrees app ealed from must therefore be reversed, and the cause remanded.
*804 The decree is as follows :
The court is of opinion, for reasons stated in writing and filed with the record,
L That the legacies bequeathed to Mrs. Hill Carter ^irley, and others, in the first clause in the will of Mary W. Cabell, dec’d, are legacies of money, and not sPecid° legacies of State bonds or stock, as held by the sa^ ^rcu^ eom't> and the said District court; but whether the said legacies are general or demonstrative, it is not necessary to decide, inasmuch as the estate is ample to satisfy the said legacies; so that it is not important to enquire whether a particular fund is appropriated to their satisfaction.
2. That under the bequest in the second clause of said will, Smyth Lee is entitled to an amount or quantity of bonds of the State of Virginia, out of those left by the testatrix, equal to the half of the whole amount of such bonds belonging to the testatrix at the time of her death; and that in ascertaining the whole amount of said bonds, to one-half of which amount the said Smyth Lee is entitled, all the bonds of the State of Virginia belonging to the testatrix at the time of her death, are to be taken into the estimate, except the $7,600 of State bonds received by the testatrix in the place and stead of the guaranteed bonds of the James River and Kanawha Canal Company, and that those bonds should not be so embraced.
3. That the bequests of guaranteed bonds of the James River and Kanawha Canal Company to the unmarried daughters of Carter Braxton and Corbin Braxton are specific legacies; and that the same were not adeemed by the surrender by the testatrix to the State of Virginia of the said James River and Kanawha Canal Company’s bonds and the acceptance by her, in lieu thereof, of bonds of equal amount of the State of Virginia, and that the said legatees are therefore, entitled to the said State bonds in the place and stead of said *805 canal bonds; and that they are not entitled to receive tbe nominal amount of such bonds in money, as held by the said Circuit court and by the said COUl't.
The court is, therefore, of opinion, that the said decrees of the said Circuit court and the said decree of the said District court are erroneous in the several particulars hereinbefore set forth, and that there is no other error therein.
Therefore it is adjudged, ordered and decreed, that the said decree of the said District court, and the said decree of the said Circuit court rendered May 8,1868, be and the same are hereby reversed and annulled, so far as the same are hereinbefore declared to be erroneous, and that that they be affirmed in all other respects. And this court proceeding to render such decree as the said District court ought to have rendered, it is further ordered that the said decrees of the said Circuit court from which the appeal was taken to the said District court, be reversed and annulled, so far as the same are inconsistent with the principles of this decree; and that the same be in all other respects, affirmed. And the cause is remanded to the said Circuit court to be further proceeded in, in conformity to this decree.
And the court doth further adjudge and order that the appellants in each of these appeals pay to the appellees their costs by them expended in the defence of said appeals respectively; which is ordered to be certified to the said Circuit court.
On motion of the counsel of C. C. Lee and others, next of kin of M. W. Cabell, dee’d, it is ordered that nothing in this decree shall prevent the said next of kin or any other party interested from asserting by proper proceedings any claim they may be advised to assert against D. J. Hartsook executor of M. W. Ca- *806 bell, dec d, on account of Ins transactions as sucli executor.
■ Decree rvcersed in part, and affirmed in pari.