By this bill the complainants seek the construction of the last will and testament and a codicil thereto of Joseph H. Shaw, who died on October 11th, 1939, leaving a will dated June 26th, 1926, and a codicil thereto dated September 29th, 1926. By his will, testator devised the residue of his estate to Fidelity Union Trust Company, of Newark, as trustee under certain trusts therein mentioned, designed mainly for the support of his wife and minor child. By the codicil testator provided as follows:
"First: Before establishing the trust set up in paragraph `Third' of my said will, I direct my executor to set aside shares of my stock in Phoenix Brass Foundry, Inc. to the value of twenty-five thousand dollars, as the same shall be appraised at the time of my death, and to assign, transfer and deliver said shares of stock to the then surviving stockholders of said Phoenix Brass Foundry, Inc. in the proportion in which they shall be holders of stock in said company, which stock in such proportion I do give and bequeath to them."
The complainants, forty in number, are those individuals who claim to have been the surviving stockholders of the Phoenix Brass Foundry, Inc., at the date of testator's death, with the exception of Florence Shaw, testator's widow, and Alfred R. Shaw, testator's son, who are made defendants to this suit. The prayer of the bill is that the will and codicil be construed and the complainants' rights thereunder determined, and that in the event that complainants are adjudged entitled to the legacy provided in the "First" clause of the codicil, distribution be ordered and directed amongst them, and that in the event that the defendants are held to have negligently and willfully refused to carry out the terms of testator's will and codicil, complainants be reimbursed for losses thereby sustained.
The main defenses to this action are two in number; first, that the legacy provided by paragraph "First" of the codicil has been adeemed, because the stock in the Phoenix Brass Foundry, Inc., referred to in that paragraph, was non-existent at the time of testator's death, the corporation having been voluntarily dissolved on or about December 31st, *Page 547 
1928; and second, that the legacy therein provided has lapsed, the legatees therein named being non-existent at the date of testator's death because of the dissolution of the Phoenix Brass Foundry, Inc., as above mentioned. It is claimed by the defendants that neither the subject of the legacy nor the legatees were in existence at the time of testator's death, hence either the defense of ademption or lapse must prevail.
The facts giving rise to this controversy, other than those stated above, are as follows: At the date of testator's will and also at the date of the codicil thereto, the testator was the president and controlling stockholder of Phoenix Brass Foundry, Inc., which had been incorporated in New Jersey in 1920 with an authorized capital stock of $100,000 divided into 1,000 shares of common stock of the par value of $100 each. Of this stock, the testator owned, at the date of his will and at the date of the codicil thereto, 366 shares. The business of that corporation was the manufacturing of brass fittings for the wholesale plumbing trade and its business expanded until 1928, when its assets were appraised at $601,630. For the purpose of providing finances for further expansion of the business, the management then determined to issue 6 1/2% convertible gold bonds to the amount of $300,000 to be secured by a first mortgage on the corporate assets. The underwriters of this proposed bond issue felt that the capital structure of the company would not warrant an issue of bonds in that amount, and suggested that that structure be remodeled and that stock in a sum equal to the appraised value of the company's assets be issued. There was some discussion between the company's management and the underwriters as to whether or not this should be accomplished by an amendment of the charter or by a reorganization through the incorporation of a new company to take over the assets of Phoenix Brass Foundry, Inc. The underwriters advised that the company's name be changed to Phoenix Brass Fittings Corporation, as more accurately describing the business of the company. Upon advice of counsel, it was decided to organize a new corporation under the name of Phoenix Brass Fittings *Page 548 
Corporation, and to transfer all of the assets of the old company to the new company, and this was accordingly done. Phoenix Brass Foundry, Inc., was dissolved pursuant to statutory proceedings and a certificate of dissolution filed in the office of the Secretary of State on December 31st, 1928. The Phoenix Brass Fittings Corporation was thereafter duly incorporated, the certificate of incorporation being filed in the office of the clerk of Essex County on January 2d 1929, and in the office of the Secretary of State on January 5th, 1929. Under date of January 2d 1929, an agreement was entered into between the old and the new companies which provided for the acquisition by the new company of the entire business and assets of the old company, including plant, real estate, good will, trade-marks, patterns, machinery, cash in bank and accounts receivable, the taking over of said business as a going concern, and the assumption by the new company of all the liabilities, contracts and engagements of the old. The contract provided for an immediate closing and for the surrender by the stockholders of the old company of all of their stock, the cancellation thereof, and the issuance to them in lieu thereof of stock of the new company in the proportion of sixteen shares of common stock of the new company for one share of common stock of the old company surrendered, and one share of preferred stock of the new company for each share of preferred stock of the old company surrendered. A deed and bill of sale were accordingly executed and delivered by the officers of the old company on January 2d 1929, by which all of the assets of the old company were transferred to the new. When this transaction and transfer of the assets and the business of the old company to the new was completed, all of the stockholders of the new company were the identical persons who had been stockholders of the old company. There were no new stockholders. The board of directors of the new company consisted of the identical persons who had previously been directors of the old company; the officers of the new company were the same persons who had been like officers of the old company. There was no change in executive, sales or factory personnel. There was *Page 549 
no change in the bookkeeping system; the ledgers, journals, and all other books constituting the integrated accounting system of the old company were taken over bodily by the new company and continued in use. There was no change in location of the business or plant, nor in the character of its business. There was no change in the substance of the enterprise, but merely in its form. After the conversion the economic participating interest of each shareholder in the corporate assets of the new company was precisely the same as it had been in the old. The testator received 5,856 shares of common stock of the new company in exchange for the 366 shares of stock of the old company which he surrendered. Subsequently and before his death, he acquired 423 additional shares of the common stock and 16 1/2 shares of the preferred stock of the new company, so that, on the date of his death, he owned 6,279 shares of common stock and 16 1/2 shares of preferred stock of the Phoenix Brass Fittings Corporation. The evidence conclusively shows that the Phoenix Brass Fittings Corporation was the successor to, and for all practical purposes, the continuing entity previously known as the Phoenix Brass Foundry, Inc., and that it was so considered by the testator. There was no hiatus between the old and the new companies recognized by him.
The primary questions to be determined in the construction of the quoted paragraph of the codicil are: Was the legacy therein provided for adeemed, or did it lapse?
In construing a will we start with the proposition that the intention of the testator as gathered from the language used is controlling unless contrary to law, or to public policy, which is a part of every law. That rule should be a constant guide to the end and the intention, if apparent, should control all presumptions and assumptions. The rule that the non-existence of the subject of a legacy evidences its ademption is but a rule of evidence, rebuttable by other evidence indicating that ademption was not intended. That has been the rule of this state for almost a century and a half. In Stout v. Hart (1801),7 N.J. Law 414, Chief-Justice Kinsey said: *Page 550 
"Upon the question of ademption, the variety and inconsistency of the opinions which seem to have been entertained by men highly distinguished for their judicial characters, is not a little surprising. It is not only impossible, by any distinctions that can be drawn, to reconcile their opinions, but it is difficult to make some of these able lawyers consistent with themselves.
 * * * * * * *
"Among the discordant decisions which have taken place, we can readily extract two propositions, which seem to, if not universally, yet generally to be recognized. 1. That there is a distinction between voluntary and compulsory payments. 2. That the first is not in itself an ademption; and that the second is not necessarily an ademption, but, at the utmost, only primafacie evidence of one, and may be explained so as to destroy this presumption."
The Chief-Justice was there referring to payments of a bond or debt which had been specifically bequeathed. After discussing a number of English cases cited by him he continued:
"All the authorities seem to recognize one general principle, that the question of ademption is, in all cases, a question of intention as are most of the cases of implied revocations of wills. Nor has any one of the authorities cited gone so far as to intimate that, when the reasons upon which the testator proceeded in calling in the debt were accounted for and explained, by reasons which indicate no change of intention toward the legatee, this shall amount to an ademption."
"In the case before us, the fact is expressly stated, that the change of the first, for the second bond, was done at the request of the surety, to accommodate, to secure, and to indemnify that surety; and, no other cause being suggested, I do not think we are warranted in inferring, from mere conjecture, any other motive. The motives stated imply rather a negation of any other, and therefore the fact being fully accounted for, leaves no reason to infer any change of intention, and consequently it is no ademption." *Page 551 
The latest express reaffirmance of this doctrine by the courts of this state that I have found is Chase National Bank v.Deichmiller, 107 N.J. Eq. 379, decided by the late Vice-Chancellor Buchanan in 1930. In his opinion in that case (atp. 382), Vice-Chancellor Buchanan said:
"A specific legacy is adeemed only when the subject is lost, destroyed or subsequently disposed of by testator, or so altered in form, by testator's subsequent acts, as to indicate a change of testamentary intent on his part. Conversely, if the subject, although somewhat changed in form, be not sufficiently changed to indicate change of testamentary intent — there is no ademption." See In re Cooper, 95 N.J. Eq. 210.
"Intent is therefore — under the law of this state at any rate — a material factor in an issue as to an ademption of a specific legacy. This is entirely logical, for a testator's whole will is simply an expression of his intent, as to the disposition of his property after his death. The one fundamental rule of testamentary interpretation is to give effect, if possible, to the testator's intent, if that intent can be determined from the whole will and surrounding circumstances."
In that case, there was a testamentary gift of 800 shares of stock later converted into 3,000 shares by a split-up and a stock dividend. It was held there was no ademption.
In Prendergast v. Walsh, 58 N.J. Eq. 149, there was a gift of "my money, now on deposit" in four banks in New York City, naming them. Before her death testatrix withdrew the money from the four New York banks and deposited it in another bank where it remained at the time of her death. Held, the legacy was specific and it was not adeemed.
The latest decision of this court touching ademption to which I have been referred is Latorraca v. Latorraca, 132 N.J. Eq. 40,
in which the testator devised his solely-owned grocery business carried on under the name of Latorraca Brothers, and later incorporated "Latorraca Bros., Inc.," and transferred the grocery business to that corporation. Vice-Chancellor Bigelow held that there was no ademption, and (at p. 43), said: *Page 552 
"There are cases in which the subject of the gift is retained by testator until his death, somewhat changed in form yet substantially the same thing. In such event the legacy does not fail; there is no ademption. Chase National Bank v.Deichmiller, 107 N.J. Eq. 379. Note in 117 A.L.R. 811."
He also said:
"In the suit before me there has been no loss of the things given, no change in their form or substance. The only change has been in the manner in which testator exercised dominion. He had legal title at the date of his will, at his death, he owned the corporation which had title. This alteration does not render the executor unable to execute the specific bequests or to carry out the testator's other directions respecting the business, since he controls the corporation, and it does not indicate a change intestamentary intention." (Italics mine.)
It must, therefore, be considered as the settled law of this state that the question of ademption is a question of intention. Counsel on both sides of this controversy define the legacy bequeathed by paragraph "First" of the codicil as "specific," but I need not decide that point. For the purposes of this decision, I shall assume that they are correct in their classification of this legacy. For a recital of and a discussion touching the various forms of legacy, see In re Low, 103 N.J. Eq. 435 (atp. 444), where it is said that "it is the identity of the thing given and not the identity of the legatee, which marks the character of a legacy as specific. That the property goes to a collection of individuals rather than to one, is of no consequence."
It should be noted, however, that the gift here was not of a specific number of shares but of shares having an appraised value as of the time of the death of the testator of $25,000.
It is true that in making this bequest the testator directed his executor "to set aside shares of my stock," and in Mecum v.Stoughton, 81 N.J. Eq. 319 (Leaming, V.C., 1913), it was held that the use of the words "my stock" or "stock owned by me" and similar language, sufficiently *Page 553 
individuates the stock then owned by testator to render the legacy specific. But in Saving Investment and Trust Co. v.Crouch, 93 N.J. Eq. 311 (Backes, V.C., 1922), where the bequest was of a certain number of shares of a known corporation, it was held that the legacy was general and not specific, and Vice-Chancellor Backes said: "The will does not specify and distinguish or ear-mark any one set of shares from the rest —the test of a specific legacy." (Italics mine.)
So here, the gift was not of so many specific shares of stock, but of stock to the value of $25,000. The legacy in fact was of a $25,000 interest in the business which the testator controlled, and it was undoubtedly his intention to benefit the legatee stockholders of his company by that bequest to the extent of the $25,000 interest in the business in which they already had some interest. If we apply the test of Mecum v. Stoughton, supra, the legacy was specific; but if it be considered merely as a bequest of an interest in testator's corporation to the value of $25,000, the legacy is general. In any event, however, I am of the opinion that the complainants are entitled to a distribution of stock of the Phoenix Brass Fittings Corporation owned by the testator at the time of his death of the value of $25,000, appraised as of that date, for I hold that whether the legacy is specific or general, it was not adeemed and did not lapse.
Assuming that the intent of the testator was to benefit those who should be stockholders of his company at the time of his death to the extent of a $25,000 interest in that company, irrespective of the character of the bequest, as I believe it was, then that intention should control.
In the University of Pennsylvania Law Review, Vol. 88, No. 6
(April, 1940), (at pp. 671 et seq.), there is a very interesting and informative article entitled "Effect of Corporate Transformation upon Ademption, Lapse and Fiduciary Appointments," by Alvin E. Evans, Dean and Professor of Law, University of Kentucky College of Law. In that article he advances what might be termed the economic equivalent or economic substitute theory as the solution of the troublesome question of ademption as applied to stock *Page 554 
or bonds of reorganized corporations substituted for stock or bonds specifically bequeathed, and the like. At pages 671-2 he says:
"We have never, however, gotten wholly away from the conviction that the intention of the testator should be considered, and courts are now more frequently following that which they believe is the intent rather than simply the difficult test of unchanged existence. In fact, it appears that the law of wills respecting ademption frequently finds itself in conflict with corporate theory expressed in many decisions, that the economic equivalent of the stock given goes to the legatee. Thus, it may be suggested that the older rule of property law which is stricter and inelastic, conflicts with the later rule of corporation law due to the rapid changes which are being made in investment practices, and which invite a different legal result."
He cites and discusses numerous American and English decisions, amongst which is Uhrig v. Johns Hopkins University,145 Md. 114; 125 Atl. Rep. 606, in which case there was a reorganization of an existing corporation by the incorporation of a new company, and bonds in the new company were substituted for bonds of the old company. It was held that there was no ademption. In discussing this case Dean Evans says (at p. 677):
"It is clearly implied, therefore, that ademption is a matter rather of intent than of change of form or substance. If the change were initiated by the testator there is room for the inference that an ademption was intended. But such an inference seems far fetched. The intent to make a substantial alteration in one's holdings need not be an intent to adeem. Here again the economic substitute may be found in the existing thing."
As already indicated, there is no doubt but that in this state the intent of the testator must govern. How far the courts in other jurisdictions have gone in giving effect to the testator's intent where the question of ademption is involved is shown byKenaday v. Sinnott, 179 U.S. 608, where a deposit of $10,000 in a bank was specifically bequeathed. The testator drew out $9,000 and invested it in bonds. The court inferred from the fact that this was a part of the provision for his wife, also because he would *Page 555 
otherwise have died partially intestate, that there was no ademption.
For other cases supporting this economic equivalent theory, seeFirst National Bank v. Perkins Institute, 275 Mass. 498;176 N.E. Rep. 532 (1931); Beck v. McGillis, 9 Barbour 35
(N.Y., 1850); Blackstone v. Blackstone, 3 Watt. 335 (Pa.,1834); Pope v. Hinchley, 209 Mass. 323; 95 N.E. Rep. 798
(1911); Stout v. Hart, supra; Doughty v. Stillwell, 1Bradford 300 (N.Y. Sup Ct., 1850); Skipwith v. Cabell, 19Gratt. 758 (Va., 1870); Walton v. Walton, 7 Johns. Ch. 238
(N.Y., 1823); Elwyn v. DeGarmendia, 148 Md. 109;128 Atl. Rep. 913 (1925).
In the article referred to, Dean Evans concludes that the solution of this question of ademption in the case of a reorganization such as is here presented depends "upon the degree of corporate continuity and thus upon the existence of an equivalent where no statute affects the matter." He says "the former test whether title passed or not was the continued identity of the subject-matter, especially in the Roman law," but "the new test is that of comparative value;" "that the rule of economic equivalent in supplanting the rule requiring substantial identity in the case of ademption," and "that there are certain considerations which should not be overlooked such as the fact that the new corporation has much the same personnel, that it continues the business, that it possesses the old assets, and has much the same powers. These matters are as significant as are the formal change of name, the enlargement of the business and surrender of charter." He concedes that no hard and fast rule should be laid down. "A rigid formal rule which requires the corporation to be identical in all essentials with its former self or to retain its charter in order to prevent a failure, or lapse of the legacy, is undesirable."
The circumstances here present meet every test suggested by Dean Evans. But quite aside from this fact, in view of our "fundamental rule of testamentary interpretation" (ChaseNational Bank v. Deichmiller, supra), the surrounding circumstances at the date of testator's will, and his conduct subsequent to the reorganization of his corporate business, *Page 556 
conclusively indicate to me that he had no intention that the legacy here in controversy should be adeemed. At the final hearing the complainant Donath testified, without objection, that the controversial clause in the codicil of testator's will was inserted therein pursuant to an agreement between Phoenix Brass Foundry, Inc., the testator, and Mr. Donath, who was the treasurer of the corporation, made in January, 1926. By this agreement it was provided that Phoenix Brass Foundry, Inc., should pay the premiums upon a $25,000 insurance policy on the life of the testator and also upon a policy in like amount on the life of its treasurer, and that these policies were to be made payable to the respective widows of the insured officers, and that, either in consideration therefor, or in fairness to the stockholders (whose moneys were being used to pay for the premiums), each of these two officials would by his last will and testament leave to the surviving stockholders stock in the company to the value of $25,000, appraised as of the date of death. Pursuant to that agreement the company paid premiums on the Shaw policy to the amount of $12,329.19, and upon his death his widow collected the insurance. Mr. Donath made an exactly similar provision in his will which was produced at the final hearing. Both wills were drawn by the same lawyer. These circumstances alone constitute a negation of any intention on the part of the testator that this legacy should be adeemed by the reorganization. Testator's widow, by refusing to give effect to his codicil, seeks to retain not only the proceeds of the insurance policy, the premiums on which were paid by the original and successor companies, but also the stock which testator agreed to bequeath to the aforesaid stockholders whose money was used to pay the premiums. It is significant that subsequent to the reorganization Mr. Donath made a new will containing precisely the same provisions as his original will, and as that contained in the codicil to the testator's will, except that the name of the new corporation was substituted for that of the old. This new will was drawn by the same lawyer who prepared the original will. This is evidence that the agreement touching the payment *Page 557 
of premiums on these two insurance policies was considered still in existence after the reorganization, at least by the complainant. And the fact that the new company continued to pay the premiums on the Shaw policy, obviously with testator's approval, shows that he also considered that agreement still in force. So much for the defense of ademption.
The defense of lapse of the questioned legacy is based upon the contention that there were no surviving stockholders of Phoenix Brass Foundry, Inc., at the time of testator's death; in other words, that the legatees were non-existent and that, therefore, there were no persons who could take under the codicil. It seems to me that what I have already said in disposing of the defense of ademption is also dispositive of the defense of lapse.
"There is a close analogy between the ademption and the lapse of legacies. In the one case the property no longer exists in the estate and in the other the beneficiary has ceased to exist. The issue of existence is the same and the same principles would seem to control." Dean Evans, article, supra (at p. 683).
As already stated, the bequest here was to certain individuals who should happen to be stockholders of a named corporation at testator's death. Those individuals were in existence at that time. The business in which a $25,000 interest had been bequeathed to them continued as before except as to the change in name and capital structure. The individual stockholders in the business remained the same. There is no difficulty with either the identity of the subject of the gift or of the takers thereof. I have already held that the stock of the new corporation stands in the place of that of the old. It follows that the stockholders of the new corporation, being the same individuals, answer to the description of stockholders of the old corporation; and they are not "non-existent." Under the circumstances of this case ademption and lapse are interdependent. If there was no ademption there could be no lapse. This defense cannot prevail.
Some further contentions on behalf of the defendants should be noted. *Page 558 
It is contended that because of the old company's certificate of consent of stockholders to its dissolution was filed on December 31st, 1928, the old company ceased to exist on that date and no longer had the capacity to make the bill of sale or execute the deed by which, on January 2d 1929, it conveyed all of its assets to the newly incorporated company, and that therefore the successor company succeeded to nothing. It is true that our statute, R.S. 14:13-1 provides that dissolution shall be accomplished upon the filing of the certificate of consent; but R.S. 14:13-4 provides for the continuation of the corporate entity for the purpose of winding up its business and disposing of and conveying its assets.
It is also claimed that after the reorganization testator took out life insurance policies on his life in which the new corporation was made beneficiary and on which it collected $45,000 upon his death, and that this indicates an intention on his part that the controversial legacy should be adeemed. The answer to this contention is that this insurance was placed pursuant to the requirements of the underwriters, was a part of the plan of refinancing already referred to, and that it had no relation whatever to the previous arrangement between testator and the company pursuant to which the premiums on the $25,000 policy in favor of his wife were paid. The premiums on the insurance in favor of the company were paid from the corporate funds.
I will advise a decree for the complainants in accordance with these conclusions and there will be a reference to a master to determine the value of testator's stock at the time of his death, unless counsel can agree on such value. *Page 559