MARY LOU PEPKA *v.* RUTH P. BRANCH, EXECUTRIX OF THE ESTATE OF PAUL R. PEPKA, DECEASED; RUTH P. BRANCH, INDIVIDUALLY AND AS LEGATEE UNDER THE LAST WILL AND TESTAMENT OF PAUL R. PEPKA; AND JOHN VINCENT PEPKA, LEGATEE UNDER THE LAST WILL AND TESTAMENT OF PAUL R. PEPKA, DECEASED.

[No. 172A24. Filed March 29, 1973.]

*Cook & Cook,* of Kokomo, for appellant.

*Raymond H. Zirkle, Bolinger and Zirkle,* of Kokomo, for appellee, Ruth P. Branch. *James R. Butcher, Butcher and Ball,* of Kokomo, for appellee John Vincent Pepka.

## CASE SUMMARY

BUCHANAN, P.J.—Plaintiff-appellant Mary Lou Pepka (Mary) appeals from a judgment entered against her and in favor of defendant-appellee Ruth P. Branch (Branch), Executrix of the Estate of Paul R. Pepka (Pepka), in an action filed by Mary for the construction of Pepka's Will alleging that a specific bequest was adeemed.

We affirm.

## FACTS

The facts and evidence most favorable to Branch and the judgment are:

In 1945 Pepka established a business in Kokomo, Indiana, known as the Pepka Spring Company (the Company), for the purpose of manufacturing coil springs. It was organized as a proprietorship and was owned, operated and controlled 100% by Pepka.

Pepka served as president, general manager, general engineer, and sales manager and normally employed four office-management employees. He determined salaries and assigned all employees to their respective positions. His sister, Branch, acted as office manager, purchasing agent, and had control of the telephone, tax reports, quality control, and personnel. Mary, his wife, was a part-time office employee relieving Branch of many of her duties. A fourth office employee was John V. Pepka (John), Pepka's son, who worked for the Company during the summers and holidays.

On August 19, 1966, Pepka executed a Will which included the following four clauses:

### "ITEM III

I am carrying certain bank accounts or savings accounts in the name of 'Paul R. Pepka Reserve Account' which are actually a part of Pepka Spring Company and they are to become assets of the Pepka Spring Company in case of my death.

### "ITEM IV

All of the real estate which I presently own is actually a part of the Pepka Spring Company and is to become a part of the Pepka Spring Company in the event of my death and all property which is carried on my books and records, such as cars and real property, as expenses of the Pepka Spring Company is to become and remain a part of the Pepka Spring Company.

### "ITEM V

I will, devise, and bequeath to my son, John Vincent Pepka, sixty-five percent (65%) of *the Pepka Spring Company*, twenty-five percent (25%) to Mary Lou Pepka, and ten percent (10%) to Ruth Mary Branch.

(Hereafter *the Specific Bequest.*)

## "ITEM VI

I hereby give, will, devise, and bequeath to my beloved wife, Mary Lou Pepka, all the rest and residue of my estate, whether it be real, personal, or mixed, and wherever situated."

(Hereafter *the Residuary Clause*.)

(Emphasis supplied.)

On December 28, 1966, about five weeks after executing his Will, Pepka caused the Company to be incorporated under Indiana law and the name of the Company became Pepka Spring Company, Inc. (also referred to herein as the Company). This action was taken on the advice of Pepka's tax accountant and after consultation with his brother, Burwell Pepka, who had incorporated a similar business owned by him in Washington. Both of these gentlemen testified that Pepka incorporated the Company for tax savings and to insure that his business would continue after his death.

On the advice of the tax accountant, Pepka retained in his own name certain assets of the business which had previously been a part of the Company. These assets included the real estate (which was then leased to the Company), the accounts receivable, the goodwill of the business, and two reserve savings accounts, one in the Union Bank in the amount of Eighty-six Dollars and Sixty-seven Cents ($86.67) and a second in First Federal Savings & Loan Association of Kokomo in the amount of Seven Hundred Thirty-four Dollars and Ninety-two Cents ($734.92). (Also held out were the accounts payable). The tax accountant testified these assets were left out of the corporation so that Pepka would not lose everything if the Company should become insolvent. Further, it was his advice that it would be easier to add assets to the new corporation than it would be to withdraw them.

The assets contributed by Pepka to the corporation included One Hundred Sixty-five Dollars and Forty-eight Cents ($165.48) cash, Five Thousand Two Hundred Twenty-five Dollars and Thirty Cents ($5,225.30) inventory, and depreciable

assets amounting to Sixteen Thousand Six Hundred Thirty-nine Dollars and Forty-two Cents ($16,639.42). They represented the only payment for stock in the new corporation, all of which was owned entirely by him, but never issued. As of November 1, 1968, less than two months prior to Pepka's death, the assets of the new corporation were Fifty-seven Thousand Eight Hundred Eighty Dollars and Eighty Cents ($57,880.80).

Uncontested evidence disclosed that after incorporation the business continued to be operated by Pepka at the same location with little change. Pepka took a salary as President and Six Hundred Dollars ($600.00) per month rental for the use of the real estate. Otherwise he continued to make all management decisions and run the business as in the past. Even though officers were nominally elected (the same personnel with the same duties as before), Pepka as President dominated the business as in the past. No change in function of the business occurred and Pepka set all salaries, determined lease rental on the real estate, and loaned himself Forty-five Hundred Dollars ($4,500.00).

Pepka expired December 26, 1968—about two years after incorporating the business and two and one-half years after executing his Will. After opening an estate, Branch, as Executrix, on February 25, 1969 filed an Inventory in Pepka's estate, which included nine hundred ninety-seven shares of stock owned by Pepka in Pepka Spring Company, Inc. Of the one thousand shares authorized, the other three shares were owned one each by Mary, John, and Branch—for which they made no payment.

A special meeting of the board of directors was then held on March 4, 1969, with John, Mary, Branch, and others present, at which time officers of the corporation were elected, to-wit: John, president; Mary, vice president; and Branch, treasurer and secretary.

On May 22, 1969, Mary, being sole residuary legatee and devisee under the Residuary Clause, filed a Petition for con-

struction of her deceased husband's Will, alleging that the gift to his son John, Branch, and herself under the terms of the Specific Bequest (Item V) of the Company failed, and therefore passed to her exclusively under the Residuary Clause (Item VI).

At the conclusion of the trial on February 12, 1970, the court ordered the parties to submit Proposed Findings of Fact and Conclusions of Law. Later, on December 7, 1970, the court adopted John's Findings of Fact and Conclusions of Law[1] and entered judgment that the Specific Bequest of

---

1. "FINDINGS OF FACT

1. That Paul R. Pepka, decedent, was the owner of Pepka Spring Company, Kokomo, Indiana, before it was incorporated.

2. That the Pepka Spring Company was incorporated on December 28, 1966.

3. That the Pepka Spring Company was incorporated basically for tax purposes.

4. That Paul R. Pepka, decedent, contributed One Hundred Sixty-five Dollars and Forty-eight Cents ($165.48) in cash, Five Thousand Two Hundred Twenty-five Dollars and Thirty Cents ($5,225.30) in inventory and depreciable assets, which consisted of equipment worth Sixteen Thousand Six Hundred Thirty-nine Dollars and Forty-two Cents ($16,639.42) to the capital structure of the new corporation.

5. That no real estate was contributed to the corporation by Paul R. Pepka.

6. That as of November 1st, 1968, the assets of the said corporation were Fifty-seven Thousand Eight Hundred Eighty Dollars and Eighty Cents ($57,880.80). Said assets consisted of cash, Ten Thousand Four Hundred Eight Dollars and Sixty-eight Cents ($10,408.68); inventory, Nine Thousand Five Hundred Dollars ($9,500.00); equipment, (less the depreciation reserve) Thirty-five Thousand Nine Hundred Fifty-nine Dollars and Twenty Cents ($35,959.20); other assets, Two Thousand Twelve Dollars and Ninety-two Cents ($2,012.92).

7. That Pepka Spring Company occupied a manufacturing building at 810 South Waugh Street, Kokmo, Indiana, prior to the incorporation.

8. That Pepka Spring Company, Inc. occupied a manufacturing building at 810 South Waugh Street, Kokomo, Indiana.

9. That Paul R. Pepka received Six Hundred Dollars ($600.00) per month as rent for said building from Pepka Spring Co., Inc. following incorporation.

10. That the corporation paid the taxes, upkeep and insurance on the building rented from Paul R. Pepka.

11. That the real estate owned by Mr. Pepka was left out of the corporation based on (the accountant) Mr. Cherry's opinion that it was better to put as little in the corporation as possible.

12. That another reason for not including the real estate was that if the corporation would at some date fail, that he would still personally

own the building and the property and the business could be started over again.

13. That the corporation opened a savings account at First Federal Savings and Loan Association, Kokomo, Indiana, in the corporation name.

14. That the monies in said account came solely from the corporation.

15. That Paul R. Pepka had a savings account at First Federal Savings and Loan Association in his name only.

16. That Paul R. Pepka had a savings account at Union Bank and Trust Company, Kokomo, Indiana.

17. That Paul R. Pepka did not draw a salary while a sole proprietorship.

18. That Paul R. Pepka did draw a salary after incorporation.

19. That salary shown on Paul R. and Mary Lou Pepka's 1968 tax return came from Pepka Spring Co., Inc.

20. That interest shown on the 1968 tax return came from First Federal Savings and Loan, Prudential Insurance Company, and the Connecticut Mutual Life Insurance Company.

21. That the rental income on the 1968 tax return came from factory buildings at 810 South Waugh Street, Kokomo, Indiana.

22. That the 1968 tax return showed Paul R. Pepka took the depreciation on the buildings at 810 South Waugh Street, Kokomo, Indiana.

23. That the corporation (in 1967 and 1968), did take depreciation on the equipment, fixtures and assets that Paul R. Pepka had transferred to the corporation.

24. That after Mr. Pepka's death, the corporation continued to operate in the same manner that it operated during Mr. Pepka's lifetime.

25. That the corporation loaned Paul R. Pepka approximately Four Thousand Five Hundred Dollars ($4,500.00).

26. That John Cherry, decedent's accountant, advised him to incorporate.

27. That another reason for incorporation aside from the tax purposes, was that in case something happened to him, the business would continue to operate.

28. That Paul R. Pepka's accountant, John Cherry, advised Mr. Pepka what to place in the corporation.

29. That Paul R. Pepka was aware of his heart trouble at the time he incorporated and said condition was discussed to a point, at the time of incorporation.

30. That Paul R. Pepka determined what amount of rent the corporation should pay him for the use of the building.

31. That after a period of eight or nine months following incorporation, the accounts receivables and accounts payables were reversed and set up as note payable to Paul Pepka.

32. That the only difference between the operation of the sole proprietorship and the corporation was changing from a single entry system to a double entry system, a bookkeeping method.

33. That the personal property taxes owed on the personal property of the corporation was paid by said corporation.

34. That up to Mr. Pepka's death, and after incorporation, this personal property was carried on the records of the Howard County Assessor's office in the name of Pepka Spring Company or Paul Pepka.

35. That the records and tax returns of Pepka Spring Co., Inc. were prepared for a full-fledged corporation.

36. That before incorporation Paul R. Pepka filed a form "C" with his individual returns.

37. That before and after incorporation Paul R. Pepka took the depreciation on the buildings.

38. That the good will of the name of Pepka Spring Company was of some considerable value.

39. That this good will was not reflected in the assets of the corporation on the tax return filed for the year of 1968.

40. That the basic reason for the land remaining in Mr. Pepka's name was so he would have an extra income, depending upon what his personal needs might be.

41. That Paul R. Pepka maintained two reserve accounts; one in the Union Bank and Trust Company and one in First Federal Savings and Loan Association prior to and after execution of his Last Will and Testament and prior to and after incorporation of Pepka Spring Company, Inc. and continued same in effect to the date of his death on December 26, 1968.

42. That, in the opinion of Ruth P. Branch, Executrix of the Last Will and Testament of Paul R. Pepka, the two reserve accounts above referred to, are the same accounts referred to in ITEM III. of the Last Will and Testament of Paul R. Pepka duly admitted to probate on the 30th day of December, 1968, in the Howard Circuit Court.

43. That Burwell R. Pepka, a brother and former partner of decedent in the spring business, incorporated his spring business in the state of Washington in 1967, and advised his brother, Paul R. Pepka, to consider incorporation to take advantage of a tax break.

44. That Paul R. Pepka did incorporate subsequent to conversations with his brother.

45. That the employees were paid by checks bearing the name of Pepka Spring Company, Inc.

46. That the corporation withheld and paid Federal Withholding Taxes.

47. That prior to incorporation Mrs. Branch and Ellen were clerical help.

48. That after incorporation Ruth Branch and Ellen retained the same status and same duties.

49. That prior to incorporation Paul R. Pepka was the General Manager, Sales Manager, Engineer, Set-Up Man, etc.

50. That after incorporation Paul R. Pepka was the General Manager, Sales Manager, Engineer, Set-Up Man, etc.

51. That there were no new, additional or different employees after the incorporation.

52. That the sole proprietorship carried on business at 810 South Waugh Street, Kokomo, Indiana, with one small office and the rest devoted to manufacturing.

53. That the corporation continued to operate within the same facilities that the sole proprietorship operated in.

54. That the primary purpose for incorporation was for tax purposes.

55. That Paul R. Pepka stated he wanted to perpetuate the business so that it would pass on to his son.

56. That prior to and following incorporation of Pepka Spring Company, Inc., the lay-out of the company was as follows: an office with

three desks, another little office with files and government packaging, another for shipping, and two separate rooms for the manufacturing of the coil springs and wire forms with all the equipment that is necessary to manufacture springs.

57. That Paul R. Pepka and Ruth Branch's duties were about the same before and after incorporation; that the other employees occupied the same status and did the same duties for Pepka Spring Company as they did for Pepka Spring Company, Incorporated.

58. That Pepka Spring Company, Inc. continued to use the same stationery, invoices and payroll checks after incorporation as were used prior to incorporation until such time as they were used up.

59. That Pepka Spring Company, Inc. continued to use purchase orders and envelopes with the name, Pepka Spring Company on them until the death of Paul R. Pepka.

60. That Pepka Spring Company, Inc. continued to advertise in the newspaper (after incorporation) as Pepka Spring Company, continued to be listed in the telephone directory as Pepka Spring Company and continued its account with Blue Cross-Blue Shield Insurance Company as Pepka Spring Company.

61. That the sign "Pepka Spring Company", located at the business, was never removed, changed or altered after incorporation.

62. That Paul R. Pepka appointed the officers of the corporation, Pepka Spring Company, Inc.

63. That Pepka Spring Company, Inc. never issued any stock, and no stock was ever paid for.

64. That Paul R. Pepka told Ruth Branch that he was incorporating to save taxes and to leave the business to his son so that he could continue same under the Pepka name.

65. That, money was transferred and interchangeable from the Pepka Spring Company, Inc. account and Paul R. Pepka's personal account after incorporation.

66. That John Vincent Pepka, son and heir of Paul R. Pepka, was employed by Paul R. Pepka to work for the Company, both before and after incorporation, and his rate of pay was determined both times by his father, Paul R. Pepka; that he worked at approximately the same jobs both before and after incorporation.

## CONCLUSIONS OF LAW

Whereupon, the Court concludes as a matter of law:

1.

Paul R. Pepka did business as a sole proprietorship under the name of Pepka Spring Company prior to incorporation of Pepka Spring Company, Inc.

2.

After Pepka Spring Company, Inc., was incorporated on December 28, 1966, the Corporation began business on January 1, 1967, and continued as a corporation continuously to the present time.

3.

That subsequent to incorporation of Pepka Spring Company, Inc., Paul R. Pepka transferred certain assets on paper previously belonging to Paul R. Pepka, d/b/a Pepka Spring Company, to Pepka Spring Company, Inc. totaling approximately Seventeen Thousand Four Hundred Eighty-four Dollars and Forty-eight Cents ($17,484.48).

**4.**

That no corporate stock of Pepka Spring Company, Inc. was ever issued by the corporation to anyone at any time.

**5.**

That Paul R. Pepka originally placed his accounts receivable in the amount of Twenty-four Thousand Eight Hundred Fifty-two Dollars and Ninety-four Cents ($24,852.94) into the corporation structure, but later withdrew same on the advice of tax counsel.

**6.**

That Paul R. Pepka, subsequent to incorporation, without any official and legal corporate action being taken, arbitrarily established the rental sum of Six Hundred Dollars ($600.00) per month for the corporation to pay him for the use of the buildings.

**7.**

That subsequent to incorporation, Pepka Spring Company, Inc. was still controlled and operated by Paul R. Pepka as an individual and no corporate stock was properly executed and issued, no officers were legally elected, no board of directors was legally elected and the business was still controlled by one man, Paul R. Pepka.

**8.**

The assets shown on the books of the corporation as of the date of decedent's death, totaled approximately Fifty-seven Thousand Eight Hundred Eighty Dollars and Eighty Cents ($57,880.80) but were in fact, controlled by Paul R. Pepka just as they were when he operated as a sole proprietorship.

**9.**

That the real estate referred to in ITEM IV of Decedent's, Paul R. Pepka, Last Will and Testament, includes the real estate located at 810 South Waugh Street, Kokomo, Indiana, which said real estate is a part of the Pepka Spring Company assets and passes as such under ITEM V. of decedent's will, since this is the clear, expressed desire, intention and will of the testator as evidenced by his words and actions.

**10.**

It is the opinion of the Court that the bequest mentioned in Item V. of the Will has not adeemed because the intention of the testator, as determined from a full and complete consideration of the Will as a whole or entire instrument, and from all of the facts and circumstances surrounding the testator at the time the Will was executed and also occurring after such execution, was that the Pepka Spring Company assets, in whatever form pass as set out in ITEM V.

**11.**

The Court is of the opinion that the reserve accounts mentioned in ITEM III. of testator's Will were never officially transferred to Pepka Spring Company, Inc. but were continually controlled by Paul R. Pepka both before and after incorporation and transferred back and forth and used interchangeably at his direction and accordingly, should and do pass as assets of Pepka Spring Company, Inc. under ITEM V. of decedent's Will since this is the express intent and desire of the testator as set out in ITEM III. of said Will.

**12.**

The Court is of the opinion that the subject matter of the legacy, i.e., the reserve accounts, the real estate owned by Paul R. Pepka at death, and the other assets of Pepka Spring Company, were not destroyed,

the Company was not adeemed. Mary filed her Motion to Correct Errors, which was subsequently overruled, and this appeal followed.

For reasons which will more fully hereinafter appear, attention is particularly directed to Conclusions of Law No. 10 and No. 13, which are set out in Footnote one.

## ISSUES

ISSUE ONE.     Did the incorporation of the business described in the Specific Bequest as the "Pepka Spring Company" so substantially change it as to effect an ademption, thereby causing Pepka's interest in the corporation to pass to Mary exclusively under the Residuary Clause?

---

alienated or extinguished or so changed in character that they could not be recognized or identified, but merely changed in form (at the advice of an accountant and the brother of decedent), and such assets in their changed form can be traced into the possession of the testator and accordingly shall pass to the legatees listed under ITEM V. of said Will.

13.

The Court is of the opinion that the intention of the testator is the controlling factor in determining the question of ademption of a specific legacy and that the intention of testator, Paul R. Pepka, as evidence by his statements to accountant John Cherry, his brother, Burwell Pepka, and Ruth Branch, near the time of the execution of his Will and the incorporation of Pepka Spring Company, Inc., as well as the acts of testator after the incorporation in the way he continued to operate his business, employ and train his son, John Vincent Pepka, indicate that his intention was to bequeath the major share of his spring company business to his son, John Vincent Pepka.

                    /s/   Robert J. Kinsey

                  JUDGE HOWARD CIRCUIT COURT

JUDGMENT

WHEREFORE, it is the judgment of this Court, and the Court so finds that ITEMS III., IV. and V. of the Testator's Will have not adeemed with respect to Ruth Branch, John Vincent Pepka, and Mary Lou Pepka and that the legatees are entitled to receive the following percentages of Pepka Spring Company, Inc.:

| | |
|---|---|
| John Vincent Pepka | (65%) |
| Mary Lou Pepka | (25%) |
| Ruth P. Branch | (10%) |

Dated: December 7, 1970

                /s/   Robert J. Kinsey

              JUDGE HOWARD CIRCUIT COURT"

ISSUE TWO.  Were John and Branch, by their conduct, estopped to deny the existence of a corporation?

ISSUE THREE.  Did the court commit reversible error by permitting Branch to testify as to Pepka's explanation of his reasons for incorporating the Company?

ISSUE FOUR.  Were the court's Finding of Fact and Conclusions of Law so erroneous, incomplete, inconsistent, or otherwise defective as to constitute reversible error?

As to ISSUE ONE, Mary argues that the Specific Bequest bequeaths only Pepka's interest in the "Pepka Spring Company" and is silent as to "Pepka Spring Company, Inc." As the business operated by Pepka as a sole proprietor was incorporated and no longer exists, the Specific Bequest of the Company has been adeemed and Pepka's corporate interest therefore passes to Mary exclusively under the Residuary Clause.

John and Branch maintain the incorporation of the business was merely a change in form and not substance as the new corporation was in almost all respects owned, operated, and controlled by the same person in the same manner as before. Further, the incorporation was carried out for tax purposes only, a mere formality.

As to ISSUE TWO, Mary asserts John and Branch are estopped to deny the existence of the corporation in their interpretation of the Specific Bequest because in anticipation of receiving the corporation's shares they voted themselves into control of the corporation.

In reply, John and Branch say Mary's estoppel argument is irrelevant for the reason that they specifically admit and recognize the existence of the corporation and are, in fact, relying upon it.

As to ISSUE THREE, Mary's position is, as we fathom it, that Branch should not have been permitted to testify as to Pepka's explanation of his reasons for incorporating the Company, because such testimony was in violation of the rule that declarations of a testator, whether made before, contemporaneously with, or subsequent to the making of the will, cannot be received to affect its construction when the intent of the testator can be discerned from the four corners of the will.

Their reply is that a will should be construed to give effect to the intentions of the testator and Branch's answer accomplished that purpose.

As to ISSUE FOUR, Mary attacks the trial court's Findings of Fact and Conclusions of Law in three categories:

(1) That the court failed to find certain facts, as submitted by Mary, which were proven by the evidence to exist;

(2) that certain Findings were erroneous and not supported by the evidence; and

(3) that certain Findings were inconsistent with each other and with the Conclusions of Law.

In reply, John and Branch contend:

(1) that the facts Mary claims should have been found were adequately covered by other Findings by the court;

(2) that the evidence does support all of the court's Findings of Fact; and

(3) that the findings of Fact are not inconsistent with each other and that the Conclusions of Law are adequately supported by the Findings of Fact.

## DECISION

ISSUE ONE.

CONCLUSION—It is our opinion that the incorporation of the business described in the Specific Bequest as the "Pepka

Spring Company" did not so substantially change it as to effect an ademption, and therefore Pepka's interest in the corporation passed to John, Mary, and Branch under the Specific Bequest and not to Mary exclusively under the Residuary Clause.

Form versus substance. Before us is a classic confrontation between these two conflicting concepts. To enter the citadel of legal truth one seeking admittance must often reckon with the twin guardians of form and substance. The seeker of justice may not give undue weight to either. While the law has frequently been criticized in the past for its worship at the shrine of form, modern jurists have often exhibited a marked tendency to strike a delicate balance between the two.

And so it is when we examine the principle of "ademption." Unless otherwise indicated by context, our use of that term in this opinion is limited exclusively to *ademption by extinction*, as opposed to other types of ademption. Nor are we here concerned with ademption by satisfaction or with revocation by some act of the testator. 6 *Page on Wills* § 54.1 (Bowe and Parker ed. 1962). The narrow inquiry prompted, of necessity, must become one of determining at what point the subject matter of the gift has so changed in form between the time of the execution of the will and the testator's death it is no longer substantially the same thing, *i.e.*, it is extingiushed.

The inquiry was characterized this way by the court in *Slater* v. *Slater* (1907), 1 Ch. 665, 672, and quoted by the Supreme Court of Pennsylvania in *In re Gerlach's Estate* (1950), 364 Pa. 207, 72 A.2d 271:

"* * * Where is the thing which is given? If you cannot find it at the testator's death, it is no use trying to trace it unless you can trace it in this sense, that you find something which has been changed in name and form only, but which is substantially the same thing."

Slight changes in form do not cause ademption. *See: Wiggins* v. *Cheatham* (1920), 143 Tenn. 406, 205 S. W. 1040

[bequest of "whiskey business" not adeemed where Prohibition laws closed the business but all the assets remained in existence]; *In re Mandelle's Estate* (1930), 252 Mich. 375, 233 N. W. 230 [stock split change in form only]; *In re Martin's Will* (1929), 252 N. Y. 582, 170 N. E. 151 [stock split]; *Hankey* v. *French* (1937), 281 Mich. 454, 275 N. W. 206 [name change in partnership only slight change].

At the other end of the form-substance pole are changes so pronounced in form that in a mechanistic sense they constitute extinguishment of the subject matter of the gift. *See: Green* v. *Green* (1950), 231 N.C. 707, 58 S.E.2d 722 [devise of mortgage but land later taken back in discharge of the mortgage]; *Welch* v. *Welch* (1927), 147 Miss. 728, 113 So. 197 [testator bequeathed Packard automobile and died owning a Lincoln]; *In re Horn's Estate* (1934), 317 Pa. 49, 175 A. 414 [common stock converted into preferred and common stock after a merger followed by stock split and stock dividend].

The case before us obviously falls somewhere in between the two poles and so we must examine with some particularity the definition of the legal doctrine of ademption by extinction.

Recognizing at the outset that we are not concerned with the *complete* physical disappearance of the subject matter of the Specific Bequest, we turn to a definition of ademption and the characteristics of the doctrine.

The most common definition of ademption is found at 96 C.J.S. *Wills* § 1172, p. 985, wherein this authority finds ademption to be an act "* * * by which a specific legacy has become inoperative because of the withdrawal or disappearance of its subject matter from the testator's estate in his lifetime."

Ademption is said to apply only to specific legacies and not to general or demonstrative legacies. When ademption of

a specific legacy occurs, the subject matter of the specific legacy is so altered or extinguished that the specific legacy is completely voided. Furthermore, the legatee is not entitled to look to the general assets of the estate for satisfaction in lieu of the specific bequest. 6 *Page on Wills* § 54.5 (Bowe and Parker ed. 1962).

Currently, in this country there are three conflicting approaches to deciding when an ademption by extinction has occurred.

There is the "ancient rule" (Ancient Rule) which originated in the Justinian Code of Rome and became part of the early common law. It is typified by the ancient English case of *Partridge* v. *Partridge* (1736), 25 Eng. Rep. 749, which used physical facts as evidence of the testator's intention to adeem to determine if ademption by extinction had taken place.

The Ancient Rule as it evolved contemplated only an analysis of the testator's intention and relegated any consideration of the nature, extent, and effect of changes or alterations of the subject matter itself to a lesser role. The intention of the testator to adeem, as gathered from the terms of the will *and* all the relevant facts and circumstances occurring between the execution of the will and the death of the testator, was the controlling principle.

Obviously, by giving free rein to the intention of the testator it becomes necessary to admit extrinsic evidence of physical facts which tend to establish the testator's intention, or lack thereof to adeem.

Because of the impracticability of applying this kind of a rule of ademption, *Partridge* v. *Partridge, supra,* was swept into a dust-bin of history by *Ashburner* v. *MacGuire* (1786), 2 Bro. C. C. 108, 29 Eng. Rep. 62, decided fifty years later, which ruled that where the thing bequeathed does not exist at the time of the testator's death it is adeemed. The same English judge three years later clarified his holding by stating that the legacy is adeemed no matter what the testator's sub-

sequent intention (*Stanley* v. *Potter* (1789), 2 Cox Ch. 180, 30 Eng. Rep. 83). This case deserved better housing than that accorded *Partridge* v. *Partridge* and is the respectable basis of the present-day English and American majority rule that ademption by extinction is based on objective facts and not on the testator's intention to adeem.

At this point in history, our beloved Indiana is one of the jurisdictions still adhering to the Ancient Rule. As to other jurisdictions adhering to the hoary past, *see: In re Packham's Estate* (1965), 232 Cal. App. 2d 847, 43 Cal. Rptr. 318; *Our Lady of Lourdes* v. *Vanator* (1967), 91 Idaho 407, 422 P.2d 74; *Kapiolani Maternity Hospital* v. *Wodehouse*, 33 Hawaii 846; *Domzalski* v. *Domzalski* (1942), 303 Mich. 103, 5 N.W. 2d 672; *Donath* v. *Shaw* (1942), 132 N. J. Eq. 545, 29 A. 2d 555; *In re Williams' Estate* (1962), 71 N. M. 39, 376 P. 2d 3.

The then Indiana Appellate Court, without specifically considering the alternatives, reaffirmed the Ancient Rule in the case of *In re Brown's Estate* (1969), 145 Ind. App. 591, 252 N.E.2d 142, with this statement:

> "In construing a will to determine whether there has been an ademption of a specific legacy, the intention of the testator is the controlling factor, the same as in the construction of all wills. Once the intention of the testator has been determined, all other rules of law pertaining to ademption must bend to such intent, so long as his intent does not violate some positive rule of law.
>
> "* * *
>
> "* * * We must look beyond the change or alteration to the intention of the testator as gathered from the will itself and all the other relevant facts and circumstances occurring between the execution of the will and the death of the testator."

The court in that opinion, concerned with whether a bequest of an undistributed inheritance in the testator's deceased brother's estate was adeemed by being in the form of traceable certificates of deposit, analyzed the doctrine of ademption and represented the Ancient Rule to be that adopted by a

majority of the states. Our research indicates otherwise, as will hereinafter appear.

A second rule used to determine whether ademption by extinction has occurred is a modified version (the Modified Rule) of the Ancient Rule. This approach is that the complete physical disappearance of the subject matter of a specific bequest constitutes an ademption independently of the testator's intention. If, however, the subject matter of the specific bequest still "exists," but has been altered in form or substance, the testator's intention must be ascertained as to whether the change has so changed the gift as to cause an ademption by extinction. *See: Succession of Levy* (1945), 207 La. 1062, 22 So. 2d 650; *Blaisdell* v. *Coe* (1927), 83 N. H. 167, 139 A. 758.

The dissatisfaction of the early English judges with the confusion and uncertainty created by applying the testator's intention rule (*Partridge* v. *Partridge, supra*) led to the third approach to ademption by extinction. Sometimes referred to as "the form and substance test," and what we refer to herein as the Modern Rule, eliminates the search for the intention to adeem and confines the task to ascertaining whether the specific subject matter of the bequest is still in existence. If there has only been a formal change in the bequest since the execution of the will, there is no ademption; but if the specific thing has changed in substance, the legacy is adeemed.

This mechanistic form-substance test ignores the intention of the parties and is the majority rule. *See*, generally: *In re Moore's Estate* (1955), 135 Cal. App. 2d 122, 286 P.2d 939; *Alexander* v. *House* (1947), 133 Conn. 725, 54 A.2d 510; *In re Keeler* (1938), 225 Iowa 1349, 282 N.W. 362; *Wyckoff* v. *Perrine* (1883), 37 N.J. Eq. 118; *Grogan* v. *Ashe* (1911), 156 N.C. 286, 72 S.E. 372; *Hoke* v. *Herman* (1853), 21 Pa. 301; *Rhodes* v. *Kebke* (1943), 179 Tenn. 480, 167 S.W.2d 345; *In re Barrows* (1931), 103 Vt. 501, 156 A. 408; *Hill* v. *Hill* (1920), 127 Va. 341, 103 S.E. 605; *Eddington* v. *Turner* (1944 Del.), 38 A.2d 738; *Eisenschenk* v. *Fowler* (1955 Fla.), 82 So.2d 876

*Thompson* v. *Long* (1947), 202 Ga. 718, 44 S.E.2d 651; *In re Wright's Will* (1960), 7 N.Y. 2d 365, 165 N.E.2d 561; *In re Kamba's Estate* (1938), 230 Wis. 246, 282 N.W. 570; *Seifert* v. *Kepner* (1962), 227 Md. 517, 177 A.2d 859; *Warren* v. *Shoemaker* (1965 Ohio), 207 N.E.2d 419; *Walsh* v. *Gillespie* (1959), 338 Mass. 278, 154 N.E.2d 906; *Lenzen* v. *Miller* (1941), 309 Ill. App. 617, 33 N.E.2d 765; 6 *Page on Wills* § 54.15 (Bowe and Parker ed. 1962); 6 *Powell, Law of Real Property* 548; Note, *Ademption by Extinction: The Form and Substance Test*, 39 Va. L. Rev. 1085 (1953).

An enlightening discussion of the Modern Rule can be found in *In re Wright's Will, supra.* The New York Court of Appeals held that:

"* * * Although, in the early days of our law, ademption was based on the intention of the testator, * * * *intention has nothing to do with the matter;* the bequest fails and the legatee takes nothing if the article specifically bequeathed has been given away, lost or destroyed during the testator's lifetime. * * * *'What courts look to now is the fact of change. That ascertained, they do not trouble themselves about the reason for the change.'* * * *

"What is significant, therefore, is the fact that the precise thing given by the will is not available for disposition at the time of the testator's death, and it matters not whether this came to pass because of an intentional and voluntary act on the part of the testator, such as abandonment, sale or gift, or because of an occurrence involuntary and unintended, such as condemnation, fire or theft." (Emphasis supplied.)

The foregoing discussion is not meant to imply that the intention of the testator has no relevance whatsoever in applying the doctrine of ademption. Its relevance is limited, however, to an examination of the four corners of the will to determine the identity or exact thing which is the subject matter of the bequest *at the time of the execution of the will.*

Generally speaking, in Indiana and elsewhere, a will is said to speak as of the date of the testator's death. Like all broad

statements there are limits to its breadth. In order to apply the doctrine of ademption, which of necessity must be done *after* the testator's death, the will is construed retroactively to the date of execution. The will becomes operative or effective after it is probated and speaks from that date as an effective instrument, but for purposes of ademption it is construed as of the date of execution to identify the subject matter of the gift. *Hankey* v. *French, supra,* recognized this distinction:

> "In Re Mandelle's Estate, 252 Mich. 375, 233 N.W. 230, 231, this court, in discussing specific, general, and demonstrative legacies, and a number of authorities pertaining to the ademption of specific legacies, said:
>
> " 'It is not expressive of the whole subject to say that a will speaks as of the date of the death of the maker. It is more accurate to say that a will is not operative until the death of the maker and then speaks the intention of the maker at the time of its execution. It has been held that: "As to specific legacies, the will speaks as of the time of its execution." ' "

*See* also: *Matter of Delaney's Will* (1909), 133 A.D. 409, 117 N.Y. Supp. 838; *In re Bradley's Estate* (1922), 119 Misc. 2, 194 N.Y. Supp. 888; *In re Brown's Estate, supra.*

Consequently, a will speaks from the date of its execution in order to ascertain the intention of the testator with respect to the identity of the gift he intended to bequeath. Beyond that point, an inquiry into the intention of the testator is not proper.

So the task of determining whether there has been an ademption is a two-step process.

The first step consists of establishing the identity of the specific bequest which the testator purports to make under the terms of the will.

The second step is the application of the Modern Rule or the form and substance test.

Once these two steps have been completed, the ademption inquiry ends. Extrinsic evidence is not admissible and any question of the testator's intention becomes irrelevant. *Lang* v. *Vaughn* (1912), 137 Ga. 671, 74 S.E. 270; *Ford* v. *Ford* (1851), 23 N.H. 212.

Notwithstanding Indiana's adoption of the Ancient Rule in *Brown, supra,* it is our opinion that the Modern Rule is more logical, less cumbersome, and easier to apply.

Three reasons lead us to this conclusion.

First, the scope of the inquiry commanded by the Ancient Rule is broad and without apparent limitations. It is an unbridled horse. Under the Ancient Rule in the guise of will construction, the evidentiary inquiry may gallop off in any direction to determine the testator's intention. It was this vagueness and confusion in applying the intention rule that caused the English courts to discard the Ancient Rule after some fifty years of experimentation. *Ashburner* v. *MacGuire, supra; Stanley* v. *Potter, supra.*

Secondly, application of the Ancient Rule could work to the detriment of the general legatees and partially or totally deplete the general assets of a decedent's estate. If the subject matter of a specific bequest has been completely destroyed and is no longer in existence, use of the Ancient Rule could result in a construction that the testator did not intend for the specific bequest to be adeemed. Based on such a construction the specific legatee, instead of losing his gift, would be entitled to a comparable gift from the general assets of the estate. Ergo, by reference to the testator's intention the courts change a specific legacy into a general legacy even though the subject matter of the gift is agreed not to exist in any form.

The final, and most important, reason to reject the Ancient Rule is that its utilization effectively emasculates the parol evidence rule and wills statutes which insist on certain formalities in the writing and execution of wills to prevent

fraud and perjury. The apparent unlimited scope of the Ancient Rule in seeking the testator's intent relative to ademption permits admission of extrinsic evidence contrary to well accepted rules proscribing the admission of such extrinsic and oral evidence in the absence of a latent ambiguity in the terms of the will when executed. *See: Hauck* v. *Second National Bank of Richmond, Indiana* (1972), 153 Ind. App. 245, 286 N.E.2d 852. Merely because there has been a change or alteration in the subject matter of a specific bequest does not mean that there is a latent ambiguity in the terms of the will at the time it was executed by the testator. Only when such latent ambiguity exists should parol and extrinsic evidence be admitted. The parol and extrinsic evidence rule should not be destroyed in the name of ademption.

Furthermore, the broad sweep of application of the Ancient Rule, carried to its logical conclusion, comes close to destroying the need for written wills. In construing a simple written will to determine whether there has been ademption of a specific legacy, the admission of the testator's oral declarations and other extrinsic evidence which bear upon his intention embraces so much evidence that the will itself may be lost in the shuffle.

The Modified Rule is equally destructive and suffers from much the same defects as the Ancient Rule.

By definition ademption concerns itself only with the nature and extent of the alteration or extinction of the subject matter of a specific bequest. The testator's subsequent state of mind as to whether he later intended to effect an ademption is irrelevant to the existence or non-existence of the gift at the time of his death. To point the inquiry in any other direction than the existence or non-existence of the gift at the time of the testator's death is contrary to reason and experience.

As 6 *Page on Wills,* § 54.6, at p. 250, reminds us:

"The real question is whether the specific property is in existence at the death of the testator, and whether testator then owns the interest which may pass under his will."

In support of the Ancient Rule, *Brown* states "that the consensus of the modern decisions" * * * "support the above statements [in construing a will to determine ademption of a specific legacy, intention of the testator is the controlling factor, etc.] in all respects."

It then cites twenty-six cases as being the consensus of the modern decisions which support the intention rule. Our analysis of these twenty-six cases, cited at page 606 of 145 Ind. App., is that only twelve apply the Ancient Rule and ten in fact expressly or impledly apply the Modern Rule. The other four we find not applicable. *In re Gerlach's Estate, supra,* cited in support of the "consensus of the modern decisions," is one of the ten citations which apply the Modern Rule and is hereinafter discussed.

A careful reading of the *Brown* case indicates a confusion of ademption with the general rules construing wills and revocation of wills.

Therefore, to the extent that *In re Brown's Estate* and any other Indiana case are inconsistent with the Modern Rule as here applied, they are expressly overruled.

Our research fails to disclose Indiana cases treating the exact question of whether ademption occurs when a testator, after the execution of his will, converts a proprietorship into a corporation. We have discovered five cases from other jurisdictions which support the conclusion that converting a proprietorship or partnership business interest into corporate form is not such a substantial change as to effect ademption by extinction: *In re Gerlach's Estate, supra* [Modern Rule applied holding no ademption resulting from change of partnership interest to corporation] ; *Latorraca* v. *Latorraca* (1942), 132 N.J. Eq. 40, 26 A.2d 522 [uncertain as to rule applied in holding no ademption resulted from change of proprietorship into corporation] ; *Hankey* v. *French, supra* [probably Ancient Rule applied holding no ademption resulted from change of

one-third interest in one partnership to one-half interest in another] ; *Arenofsky* v. *Arenofsky* (1954), 29 N.J. Super. 209, 102 A.2d 101 [cites *In re Gerlach's Estate, supra,* but probably applied Ancient Rule holding no ademption resulted from change of partnership interest into corporation] ; *Mitchell* v. *Mitchell* (1945), 208 Ark. 478, 187 S.W.2d 163 [Ancient Rule applied holding no ademption resulted from change of corporate interest to proprietorship].

Frequently cited in support of the proposition that subsequent incorporation of a business interest does not amount to an ademption is *In re Gerlach's Estate, supra.* Unlike some cases treating this subject which cite cases applying the Modern Rule (including English cases) and then proceed to apply the Ancient Rule, *Gerlach* carefully propounds and applies the Modern Rule.

In *Gerlach,* the testator owned a business known as the Allentown Supply Company which he operated as a proprietorship at the time he executed a will containing a specific bequest of his interest in the "business known as the Allentown Supply Company." Subsequently he incorparted the business under the name of Allentown Supply Corporation—all but a few shares of the unissued stock were owned by the testator and apparently all the assets of the partnership went into the corporation.

In upholding the testator's specific bequest of his interest in the Allentown Supply Company and determining that there was no ademption of this specific bequest, the Supreme Court of Pennsylvania analyzed the change in form this way:

"The bequest of testator's interest in his business was, of course, a specific one and therefore subject to ademption if the business was extinguished before his death. * * * The change in the subject of the bequest in the present case was obviously not like the one where real estate devised in a will was sold by the testator and what he owned at his death was a purchase money mortgage on the property. In re Gibson's Estate, 22 Pa.Dist.R. 482 * * *. * * * What the testator bequeathed in the present case was not an

interest in a *partnership* as such, nor in a corporation as such, but an interest in *his business* as it existed at the time of his death,—in his business *enterprise*, whatever its form. Since his interest in the corporation remained the same as his interest in the partnership, and since no change of any kind took place in the operation of the business, no ademption of the legacy resulted." (Original emphasis.)

As is apparent from the court's language in *Gerlach*, what the testator bequeathed was "an interest in *his business* as it existed at the time of his death,—in his business enterprise, whatever its form." With these words we agree.

The Pennsylvania court went through the two-step process referred to above of first determining what was intended to be bequeathed by the specific bequest and then determining whether the subject matter of that gift existed at the time of the testator's death.

We proceed to apply the Modern Rule to the facts of the case before us.

Reading Items III, IV, and V of the Will indicates that Pepka intended to bequeath "certain bank accounts or savings accounts" and real estate on which the Company was operated, to the legatees named in the Specific Bequest because these assets were "actually a part of the Pepka Spring Company." So Pepka endeavored by these three provisions to make certain that all parts of the business would pass together under the Specific Bequest. This leaves the reader of these three Items with the unmistakable impression that at the time the Will was drawn Pepka unequivocally intended to bequeath the business as a whole.

In reviewing the essential facts we find that Pepka's Will was executed August 19, 1966. The business, minus certain assets which remained in his name, was incorporated on December 28, 1966. Two years later Pepka died, still operating the business as he had in the past.

After incorporation there was no change in the business, its location, or employees.

Even those assets which remained in his name and were not part of the incorporation remained in his ownership at the time of his death.

The record does not indicate the exact value of the business at the time of the execution of the Will and the value of the business at the time of Pepka's demise. While he held out the real estate, the accounts receivable (and payable), the goodwill of the business, and two small bank accounts, substantial assets were put into the new corporation (as of November 1, 1968, $57,880.80). More important, those assets not put into the corporation remained in recognizable form at the time of Pepka's death and were being utilized as a part of the business.

Mary would have us believe that ademption occurred because "the asset change is material." However, the assets withheld from incorporation were still in Pepka's name when he died and therefore were part of the business which formed the subject matter of the Specific Bequest. Pepka, therefore, not only intended to convey the business known as the "Pepka Spring Company," but it existed, substantially intact, at the time of his death.

In the polarity of form and substance, if form is 12:00 o'clock and substance is 1:00 o'clock, the minute hand did not reach quarter after the hour.

By holding that no ademption by extinction (or by change in substance) took place by the incorporation of this particular proprietorship under the terms of this particular Will, we are not "piercing the corporate veil." Flowing from the incorporation of a business there are numerous changes in the rights, duties, and obligations of the parties participating therein or affected thereby, but the change in form of the business by incorporation, which was the essential thing bequeathed, did not change it substantially, notwithstanding a new entity was created. In the transition, the essential thing was only altered in form. *In re Gerlach's Estate, supra;*

*Latorraca* v. *Latorraca, supra; Hankey* v. *French, supra; Arenofsky* v. *Arenofsky, supra; Mitchell* v. *Mitchell, supra;* 6 *Page on Wills* § 54.11 (Bowe and Parker ed. 1962) ; 96 C. J. S. *Wills* § 1177g(1), p. 999.

This conclusion may rationally be reached based on evidence before the trial court and which was part of the Findings without reference to evidence indicative of the intention of the testator *subsequent* to the date of execution of the Will. Conclusions of Law 10 (no ademption because testator's intention as determined from facts and circumstances before and *after* execution of the Will) and 13 (the intention of testator is controlling factor in determining ademption of a specific legacy) and facts set forth in the Findings supporting those Conclusions, are erroneous because they are based on application of what we have referred to here as the Ancient Rule—probably in reliance on *In re Brown's Estate, supra,* which we have specifically overruled.

For the reasons indicated, we adopt the Modern Rule as the soundest method of determining ademption by extinction.

ISSUE TWO.

CONCLUSION—It is our opinion that John and Branch, as legatees under the Specific Bequest, are not estopped to deny the existence of the corporation. Mary's argument that as John and Branch both participated in the affairs of the corporation after Pepka's death they are estopped to deny its existence, has no bearing on the central question of whether there was or was not an ademption of the Specific Bequest. It is irrelevant, particularly so in that they explicitly acknowledge the existence of a corporation which they say is the same business in a different form which has not been so changed as to be extinguished.

ISSUE THREE.

CONCLUSION—It is our opinion that the trial court did not commit reversible error by permitting Branch to testify

concerning Pepka's explanation to her of his reasons for incorporating the Company.

This testimony was cumulative of prior testimony. Both Pepka's tax accountant and brother testified that the reasons for incorporating the Company were for tax savings and to insure the continued operation of the business after Pepka's death.

In view of our previous conclusion that the scope of the inquiry to determine if ademption has taken place is limited to whether the subject matter of a gift is in existence at the time of the testator's death, the trial court erred in admitting any evidence relating to the reasons why changes did or did not occur in the subject matter of the gift after the execution of the Will. However, the error caused by the admission of such evidence is not cause for reversal as the judgment correctly held that the Specific Bequest was not adeemed. Mary was not prejudiced. Rule TR. 61.

ISSUE FOUR.

CONCLUSION—It is our opinion that the trial court's Findings of Fact and Conclusions of Law were not so erroneous, incomplete, or inconsistent as to constitute reversible error.

In Part 1 of her argument under ISSUE FOUR, Mary contends that the trial court's Findings of Fact were incomplete because the court failed to find certain "facts" tendered by her, which had support in the evidence. Our examination of Mary's Proposed Findings of Fact and the court's Findings of Fact reveals that most of the "facts" tendered by her were adequately treated by the court's Findings of Fact. Findings of Fact must be considered as a whole and not in isolated or detached portions. *Jones* v. *Greiger* (1960), 130 Ind. App. 526, 166 N.E.2d 868; *Murrin* v. *Cook Bros. Dairy, Inc.* (1956), 127 Ind. App. 23, 138 N.E.2d 907.

Although a few of Mary's tendered Findings of Fact were not specifically covered by the court's Findings of Fact, we are of the opinion that these facts were either so incidental as to not be of significance or simply not within the realm of credible evidence. As stated by Rule TR. 52(A):

"* * * due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. * * *"

In a case tried by the court, it, as the trier of fact, may reconcile, reject or accept, and weigh the evidence, and determine the credibility of witnesses. *General Electric Co.* v. *Fuelling* (1968), 142 Ind. App. 74, 232 N.E.2d 622; *Bennett* v. *Pearson* (1966), 139 Ind. App. 224, 218 N.E.2d 168.

In Parts 2 and 3 of her argument under ISSUE FOUR, Mary complains that certain facts found by the court are not supported by the evidence and that certain Findings of Fact are inconsistent with each other and with the Conclusions of Law. Again we find no substantial cause for complaint and remind Mary that Rule TR. 52(A) states:

"* * * the court on appeal shall not set aside the findings or judgment unless *clearly erroneous, * * *.*" (Emphasis supplied.)

Thus, a finding upon an issue against a party with the burden of proof will be reversed only if the evidence is uncontradicted and will support no reasonable inference in favor of the finding. *A. S. C. Corp.* v. *First National Bank* (1960), 241 Ind. 19, 167 N.E.2d 460. As indicated in our discussion of ISSUE ONE, Conclusions of Law 10 and 13 incorrectly state the law and there are Findings of Fact based on inadmissible evidence as to Pepka's intention after execution of his Will, all of which are erroneous. However, there are other Findings of Fact which properly support the judgment that

the Specific Bequest was not adeemed. Because it would serve no useful purpose to reverse the trial court's judgment, it is affirmed.

Sullivan and White, JJ., concur.