[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 429 
This appeal involves the administration of an estate. The legal issue presented is whether a legacy of a certificate of deposit, designated in the will by the testatrix as "CD Account #005-0001274 with the First Bank of Dothan, Dothan, Alabama," was a specific bequest that adeemed when the testatrix transferred the funds in the specified certificate-of-deposit account into two separate certificate-of-deposit accounts, of approximately equal value, numbered 2843 and 2844.
Sara Parker, the executrix of the estate and the appellant here, argues that the certificate of deposit designated in the will as "CD Account #005-0001274 with the First Bank of Dothan, Dothan, Alabama" (hereinafter "CD 1274") did not exist at the time of the testatrix's death and that therefore an ademption had occurred.
The legatee of C.D. 1274, Marguerite W. Bozian,[1] the appellee here, argues that no ademption occurred because the funds represented by C.D. 1274 were used by the testatrix to obtain two certificates of deposit that were for a longer term and that paid a higher rate of interest than did C.D. 1274; that the two certificates of deposit into which the funds from C.D. 1274 were deposited were designated as being in the testatrix's portfolio at First Bank; and that the renumbering of the two certificate-of-deposit accounts was for the convenience of the bank.
The trial judge, in a bench trial, heard conflicting ore tenus evidence. The evidence was conflicting regarding the reason for the testatrix's dividing the proceeds of C.D. 1274 and opening two certificate-of-deposit accounts, of approximately equal value. Parker, who is the legatee of the sizable residuary estate, contends that the testatrix took this action because Bozian was talking about putting the testatrix in a nursing home. Bozian argues that the testatrix took the action she took with regard to C.D. 1274 because she wanted to deposit the money for a longer term and to get a higher rate of interest. Bozian also argues that the testatrix took similar action at other banks where she had certificate-of-deposit accounts, in order to get a higher rate of interest.
The trial judge found in favor of Bozian, and Parker appealed. We affirm.
 Facts
Effie Roney Wilson died on April 20, 2001. Parker, a niece, was appointed the executrix of Wilson's will, which was executed by Wilson on April 27, 1995. Wilson, in "Item Two" of her will, made specific devises of sums of money to several *Page 430 
individuals and to a church, and in "Item Four" she gave "[a]ll the rest, residue and remainder of my estate . . . to Sara Parker."
The dispute between the parties revolves around the construction of "Item Three" of her will, which reads as follows: "I give, devise and bequeath to Marguerite W. Bazian [sic], my C.D. Account #005-0001274 with the First Bank of Dothan, Dothan, Alabama."
Because a dispute arose between Parker, as executrix, and Bozian, the legatee, regarding the interpretation of Item Three, Bozian filed an action against Parker seeking a declaration that the funds in the two certificate-of-deposit accounts were given to her under Wilson's will. She asked the trial court to order Parker to transfer the funds in those certificate-of-deposit accounts to her.
In her complaint she alleged that Wilson, on March 16, 1992, deposited $69,646.50 with First Bank, and received a six-month certificate of deposit, with automatic renewal provisions, and that First Bank designated the account as C.D. 1274. She further alleged that on the last maturity date of C.D. 1274, March 16, 2000, Wilson "transferred, swapped, or rolled the matured existing funds (identified as C.D. 1274) into another account or contract . . . for the purpose of increasing the rate of interest from 4.5% to 7%." In her declaratory-judgment action, Bozian further alleged that "[a]t the time of the swap, roll over, or transfer, the funds on deposit with the Bank were divided into two accounts, one being designated as C.D. account number 2843 (C.D. 2843) in the amount of $49,594.98, and the other being designated as C.D. account number 2844 in the amount of $49,594.97," and that "[t]he new C.D. accounts were derived solely and fully from the existing C.D. 1274."
The evidence presented shows that, before Wilson executed her will, she had previously opened a certificate-of-deposit account at First Bank, into which she deposited $69,646.50 for a six-month term. The certificate of deposit was dated March 16, 1992, bore the number 1274, and contained automatic renewal provisions at maturity. No beneficiary was listed on the account; it is undisputed that the funds were payable to Wilson's estate upon her death.
On March 16, 2000, the maturity date for C.D. 1274, Wilson was taken to First Bank by Shelby Parker, Parker's husband. The evidence is uncontradicted that on that date the C.D. 1274 account was the only account Wilson had at First Bank; it is also undisputed that at that time First Bank was paying interest at the rate of 4.5% on C.D. 1274, but was paying an interest rate of 7% on a 24-month certificate of deposit.
Lisa Merritt, the bank officer who assisted Wilson, testified at the trial. Although she testified that she could not recall the specific transaction, she did testify that Wilson did not add any money to, or subtract any money from, the C.D. 1274 account, which at that time amounted to $99,189.95. Wilson transferred the entire amount in C.D. 1274 into two separate 24-month certificates of deposit, C.D. 2843 and C.D. 2844, the interest on which was 7%. Merritt testified that the bank numbered the two certificates of deposit as 2843, in the amount of $49,594.98, and 2844, in the amount of $49,594.97. Merritt testified that even though the two new certificates of deposit had different numbers than did the original certificate of deposit, the moneys in the two accounts represented by the certificates of deposit remained under the same portfolio number with the bank, and *Page 431 
were the "same money."[2]
At the time of Wilson's death, Parker refused to give Bozian the funds in the two certificates of deposit, because she was of the opinion that the certificate of deposit enumerated in the will had been closed out and the gift to Bozian had adeemed.[3] *Page 432 
Parker and Bozian are first cousins; they were described at trial as being favorite nieces of Wilson.[4] Regarding the facts of this case, Parker testified that before Wilson died she did not know Wilson had a certificate of deposit at First Bank, but she testified, over objection, that at about the time Wilson made the change in the certificate of deposit at the bank Wilson mentioned to her that Bozian was asking Wilson which nursing home she would prefer, and that Wilson was upset about this.
Bozian testified, without objection, that in 1995 when she executed her will, Wilson said to her, "I've taken care of you." Bozian also testified that shortly before her death Wilson had told her she had greatly increased the benefit to Bozian because she was able to get a higher interest rate.[5] *Page 433 
It is undisputed that Wilson did not change her will after she split C.D. 1274 into two CDs, although the record shows that Parker and her husband offered to carry Wilson to a lawyer to change her will if she wanted to change it.[6] Bozian also presented evidence indicating that within two weeks of the date Wilson changed her C.D. 1274 at First Bank, she went to other banks in Dothan and readjusted her certificates of deposit in those banks to secure higher interest rates on those certificates of deposit.
George Liverani, whose second wife was a niece of Wilson's, helped Wilson with some of her bookkeeping. He balanced her checkbook and kept a record of the interest income she made on CDs that she had, except when she changed the term on the CDs. He testified that he no longer took care of them after that. Mr. Liverani was asked if he knew of any animosity between Bozian and Wilson, and he said that he was not aware of any. He was asked approximately how much money Wilson had in the various banks, and he testified that "[t]he last figure I gave Ms. Effie in her checkbook was roughly around $880,000." He further testified that the money was "[i]n six banks and CD's." It is undisputed that if the bequest of C.D. 1274 is considered to have adeemed, the deposits in the two CDs will go to Parker, as the residuary legatee, and that Bozian will get nothing.
 Scope of Review
It is axiomatic that when a trial judge, sitting without a jury, receives evidence ore tenus, his or her findings of fact, based on that evidence, are presumed to be correct and a judgment based on those findings will not be reversed unless the judgment is unsupported by the evidence or is plainly and palpably wrong. In Eubanks v. Hale,752 So.2d 1113, 1144-45 (Ala. 1999) (opinion on return to second remand), this Court stated:
 "`[W]e will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence.' Williams v. Lide, 628 So.2d 531, 534 (Ala. 1993), *Page 434 
citing Mitchell v. Kinney, 242 Ala. 196, 200, 5 So.2d 788, 797 (1942). However, the ore tenus rule does not extend to cloak a trial judge's conclusions of law, or incorrect application of law to the facts, with a presumption of correctness. As this Court has held, `when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment.' Griggs v. Driftwood Landing, Inc., 620 So.2d 582, 586 (Ala. 1993)."
See Ex parte Hurricane Freddy's, Inc., [Ms. 1010643, Sept. 27, 2002] ___So.2d ___, ___ (Ala. 2002). See also Watkins v. Central Contracting,Inc., 603 So.2d 899, 901 (Ala. 1992), where this Court said:
 "We note that when a trial court, without a jury, hears ore tenus evidence its judgment is presumed to be correct and will not be reversed on appeal unless the appellate court finds it to be unsupported by the evidence or plainly and palpably wrong, after considering all the evidence and after making all reasonable inferences from that evidence. Spruiell v. Robinson, 582 So.2d 508 (Ala. 1991)."
Parker does not dispute the principle of law relating to ore tenus evidence, but she argues that "a specific bequest under the will . . . adeemed when the deceased . . . changed the nature of the gift prior to her death." She argues that "[t]he caselaw reflects that when property specified under a will no longer exists in the estate the gift is lost and the legatee should not take anything under the will."
 Analysis
We begin our analysis of this appeal by stating some elementary principles of law applicable to the construction of wills. In Cottinghamv. McKee, 821 So.2d 169, 171-72 (Ala. 2001), this Court summarized the law as follows:
 "The Alabama Legislature has established that '[t]he intention of a testator as expressed in his will controls the legal effect of his dispositions.' § 43-8-222, Ala. Code 1975. `In Alabama the law is well settled that "the intention of the testator is always the polestar in the construction of wills, and that the cardinal rule is to give that intention effect if it is not prohibited by law."' Hansel v. Head, 706 So.2d 1142, 1144 (Ala. 1997), quoting deGraaf v. Owen, 598 So.2d 892, 895 (Ala. 1992). `To determine the intent of a testator or testatrix, the court must look to the four corners of the instrument, and if the language is unambiguous and clearly expresses the testator's or testatrix's intent, then that language must govern.' Born v. Clark, 662 So.2d 669, 671 (Ala. 1995)."
In First National Bank of Birmingham v. Klein, 285 Ala. 505, 508-09,234 So.2d 42, 45 (1970), this Court also discussed the applicable law when, as in the present case, there is a specific bequest and a residuary clause. This Court said:
 "As we said in Mastin v. First National Bank of Mobile, 278 Ala. 251, 177 So.2d 808 (1965), certain principles governing the construction of wills in this state are settled. They are:
 "(1) The intention of the testator is always the polestar in the construction of wills, and the cardinal rule is to give it effect if not prohibited by law.
 "(2) The intention of the testator may be ascertained not only by the writing itself, but from the light of attending facts and circumstances, and,
 "(3) In arriving at that intention, the court should consider the instrument as a whole.
 "A will should also be construed to uphold rather than defeat devises and bequests. Willis v. Barrow, 218 Ala. 549, 119 So. 678 (1929). The law presumes, particularly where a residuary *Page 435 clause is involved, that the testator intended to dispose of his entire estate by will rather than die intestate, and unless a contrary intent is clearly expressed, courts will endeavor to reconcile inconsistent or repugnant provisions and adopt any reasonable construction to this end. Marshall v. Northern Trust Co. of Chicago, 22 Ill.2d 391, 176 N.E.2d 807 (1961)."
(Emphasis supplied.) The law with respect to the ademption of a bequest is well settled. As this Court stated in Matthews v. Matthews,477 So.2d 391, 393 (Ala. 1985):
 "A specific bequest adeems if the property specified is not a part of the estate upon the death of the testator. Conversely, a general bequest does not adeem in this situation. Rowe v. Newman, 290 Ala. 289, 300, 276 So.2d 412, 422 (1972); Ullmann v. First National Bank of Mobile, 273 Ala. 154, 157, 137 So.2d 765, 767
(1961).
 "A specific bequest is defined as `a bequest of a particular article or specific part of the testator's estate which is so described and distinguished from all other articles or parts of the same as to be capable of being identified.' Rowe, 290 Ala. at 299, 276 So.2d at 421; Ullmann, 273 Ala. at 157, 137 So.2d at 767."
As we understand Parker's argument, she contends that when Wilson closed out the account in C.D. 1274 and reopened two new C.D. accounts, she thereby created an ademption. What is an ademption? In Carter v. FirstNational Bank of Opp, 237 Ala. 47, 185 So. 361 (1938), this Court adopted the definition of an ademption as stated in 28 R.C.L. 345, § 341:
 "`The distinctive characteristic of a specific legacy is its liability to ademption. If the identical thing bequeathed is not in existence, or has been disposed of so that it does not form a part of the testator's estate, at the time of his death, the legacy is extinguished or adeemed, and the legatee's rights are gone. The rule is universal that in order to make a specific legacy effective the property bequeathed must be in existence and owned by the testator at the time of his death, and the nonexistence of property at the time of the death of a testator which has been specifically bequeathed by will is the familiar and almost typical form of ademption. This may result from a variety of causes, such as a gift during the lifetime of the testator, of the particular article which was the subject matter of the legacy, its consumption, loss, death, or sale, and in each of such instances the courts have held that the legacy is adeemed.'"
237 Ala. at 48, 185 So. at 362. In Carter, the Court further stated:
 "And, as follows, from 69 Corpus Juris 1006, section 2205: `The general rule is that the legacy is adeemed if the thing given is gone when the will takes effect, and does not continue in existence, distinguished from the rest of the testator's estate, at the time of his death, either where it has ceased to exist or has been disposed of by the testator during his lifetime.'"
237 Ala. at 48-49, 185 So. at 362.
Based on the above-stated principles of law relating to a specific legacy, it seems apparent that the bequest in this case was a specific legacy and has adeemed if the thing given is gone when the will takes effect. The question then becomes: has the specific legacy of the certificate of deposit adeemed because an account designated by a specific number in the will did not exist at the time of the testatrix's death because the testatrix had transferred the funds from that account *Page 436 
into two certificate-of-deposit accounts? We think not.
Although we have been unable to find an Alabama case in which a certificate of deposit has been the subject of an ademption, our attention has been called to a case decided by the Court of Civil Appeals of Alabama, Scott v. Wallace, 686 So.2d 1241 (Ala.Civ.App. 1996). Scott
involved a certificate of deposit that was part of an estate. In that case, the court affirmed the judgment of the Probate Court of Mobile County that a bequest of "cash money" in the testator's will included the testator's bank and NOW (negotiable order of withdrawal) accounts and certificates of deposit, as well as currency and coins. In Scott, the court, although noting that it could not find "a generally applicable definition of `cash money,'" held that "[s]urely a deposit to a bank secured by a certificate is an `account' with that bank." 686 So.2d at 1244.
Parker contends that the holding in Scott is not dispositive. She argues that "[t]he law is clear that a specific bequest in a will adeems if the property specified is not a part of the estate upon the death of the testator," citing Matthews v. Matthews, 477 So.2d 391 (Ala. 1985);Carter v. First National Bank of Opp, 237 Ala. 47, 185 So. 361 (1938); and Gilmer's Legatees v. Gilmer's Executors, 42 Ala. 9 (1868). Although this Court determined in each of the cases cited by Parker that an ademption did occur, we believe that the facts in those cases are sufficiently different from the facts of this case that each is distinguishable.
As we stated earlier, we have found no Alabama case that specifically addresses whether an ademption occurs when the subject of the controversy is a certificate of deposit, but our research indicates that some other jurisdictions have considered the question. In Sammons v. Elder,940 S.W.2d 276 (Tex.Ct.App. 1997), the appeal involved the construction and interpretation of a "savings account and/or savings certificate." After a bench trial, the court found that all but two of the decedent's various money-market accounts, certificates of deposit, and individual retirement accounts constituted a "savings account and/or savings certificate," 940 S.W.2d at 279, thereby passing to her two children under the will. The trial court found that the two remaining accounts were checking accounts, which passed equally to the decedent's stepdaughter and her two children. The appellant in that case complained of the trial court's rulings regarding the existence of a "savings account and/or savings certificate." The trial court found that the term used in the will was ambiguous and, as permitted by Texas law, took extrinsic evidence. In affirming the judgment of the trial court, the Texas Court of Appeals held (1) that the trial court did not err as a matter of law in finding a savings-account provision in the will to be ambiguous; (2) that the trial court properly considered extrinsic evidence in construing the ambiguous provision; (3) that for purposes of the testatrix's bequest the savings account and/or savings certificate was an account or certificate, which usually bore interest in the financial institution to which the moneys were deposited so that they were protected from loss or destruction; (4) that the certificates of deposit were properly characterized as savings accounts or savings certificates; and (5) that the individual retirement accounts were properly characterized as savings accounts.
In Chandler v. Owen, 233 Ga. 25, 209 S.E.2d 618 (1974), the Supreme Court of Georgia held that a specific legacy of a house and lot, which was to be sold by the executor and the proceeds invested in government bonds, to be distributed equally between two nieces, was not adeemed *Page 437 
when the testatrix sold the house and lot before her death and invested the funds in certificates of deposit.
In Gist v. Craig, 142 S.C. 407, 141 S.E. 26 (1927), the testatrix bequeathed to Epworth Orphanage the "proceeds" of the collection of notes and mortgages owned by her, which the executors were directed to collect and then to pay the proceeds over to the orphanage. The testatrix collected the notes and mortgages after she executed the will, and for the funds she obtained two certificates of deposit. The identity of the funds was established by the evidence. The South Carolina Supreme Court held that the legacy did not adeem and that the orphanage was entitled to the certificates of deposit. See also Rikard v. Miller, 231 S.C. 98,97 S.E.2d 257 (1957).
In Pepka v. Branch, 155 Ind. App. 637, 294 N.E.2d 141 (1973), the leading case in Phillip E. Hassman, Annotation, Ademption of Legacy ofBusiness or Interest Therein, 65 A.L.R.3d 5541 (1975), the Court of Appeals of Indiana held that a form-and-substance test is the applicable test for determining whether an ademption by extinction of a specific legacy has occurred. The court further held that the testator's conversion of his sole proprietorship into a corporation after the execution of his will, which indicated an intention to bequeath the business as a whole, did not so substantially change the bequest of the proprietorship as to effect an ademption where, after the incorporation, there was no change in the business, its location, or employees; where the testator was, at his death, still operating the business as he had in the past; and where, although the testator withheld certain assets from the corporation, those assets were in the testator's name when he died and were still part of the business. Even though the American Law Reports annotation deals with the ademption of a business or interest therein, a section of that annotation appears helpful in this case. The following appears at 65 A.L.R.3d 554:
 "In an effort to give the fullest effect to a testator's testamentary desires some courts will not declare the legacy of a business or interest therein to have been adeemed unless the evidence indicates that the testator intended his disposition of the subject matter during his lifetime to work an ademption. The following cases involving an alleged ademption of the legacy of a business or interest therein support the proposition to the effect that the testator's intentions govern a determination of whether a change in the subject matter of the legacy of a business or interest therein, made during the lifetime of the testator, has worked an ademption of the legacy."
See also In re Estate of Kolbinger, 175 Ill. App.3d 315, 529 N.E.2d 823
(1988), in which the Appellate Court of Illinois held that a certificate of deposit and a savings account, which had replaced premises that had been devised by the testatrix to her two sons, stood in the place of the property that had been destroyed by fire and were therefore specifically bequeathed under her will and had not adeemed where the testatrix, since the destruction of the property until her death, remained unable to manage her affairs and did not have the capacity to indicate a contrary intention from that expressed in her will. But see In re the Estate ofMayberry v. Mayberry, 318 Ark. 588, 886 S.W.2d 627 (1994). In Mayberry, the Supreme Court of Arkansas held that an ademption occurred as to a specific bequest of a life estate in a savings account when the testatrix closed the account and purchased certificates of deposit. The Mayberry
case is distinguishable, because the Court found that several sources of funds in addition to the funds in the savings *Page 438 
account were used to purchase the certificates of deposit, and the value of the certificates of deposit was more than the value of the saving account. Also see Jennings v. National Bank of Commerce of Pine Bluff,270 Ark. 735, 606 S.W.2d 130 (1980), in which the Court of Appeals of Arkansas held that a specific bequest in a will of any real or personal property owned by a corporation in which the testatrix held a trust interest and any and all interest she might own and any and all real or personal property passing to her pursuant to her husband's will was adeemed by the sale during her lifetime of the trust interest for cash where she took no actions whatsoever to indicate that she intended the cash proceeds, which represented a change in form, to go to the appellant. Further, see Church v. Morgan, 115 Ohio App.3d 477,685 N.E.2d 809 (1996), where the testator had bequeathed funds in a specific bank account, but had withdrawn the funds from the account and used the withdrawn funds to open a certificate-of-deposit account. The Ohio Court of Appeals, with one judge dissenting, held that an ademption had occurred.
 Summary
Parker argues that "[t]he law is clear that a specific bequest in a will adeems if the property specified is not a part of the estate upon the death of the testator." She cites Matthews v. Matthews, Gilmer'sLegatees v. Gilmer's Executors, and Carter v. First National Bank ofOpp, in support of her argument. The facts in those cases are sufficiently different from the facts of this case that those cases are distinguishable. In Matthews, for example, the devise was of 150 shares of Litton Industries stock, which a majority of this Court determined was a specific devise; at the time of the testator's death, the 150 shares had been redeemed by the corporation and were not a part of the estate. In Gilmer, this Court held that bonds, which were given as a general legacy, were utterly worthless, and the bequest adeemed and the legatees took nothing. In Carter, the testator provided in his will: "I have applied for $2,000 in insurance with my daughter as beneficiary, and it is my will that she receive the proceeds thereof in lieu of any other bequest by me." 237 Ala. at 48, 185 So. at 361. The testator's wife died and he remarried. A child was born of that marriage. This Court noted "that the will bequeathing the policy to appellant was made at a time when she was the sole beneficiary in the policy and only child of testator." 237 Ala. at 48, 185 So. at 362. This Court also noted that the testator had effected a change in the policy so as to include his son by the second marriage as a joint beneficiary, but he had made no change in the will. The insurance company filed an interpleader action and the trial court ruled that the two children would share equally in the proceeds of the policy. The Supreme Court affirmed.
In each of the above-cited cases, the testator had taken action that caused the bequest to adeem. In the instant case, the evidence seems uncontradicted that the funds on deposit in First Bank as evidenced by C.D. 1274, were not withdrawn, added to, or otherwise changed, but were split into two certificates of deposit, of approximately equal value. It is also undisputed that the numbering system used by the bank for the two certificates of deposit was for the convenience of the bank, and that the money on deposit in the two certificates of deposit was identified by the bank as being in the same portfolio as had been C.D. 1274. In addition, evidence was admitted without objection that showed that Wilson told Bozian, "I've taken care of you," and that about the time Wilson split the certificate of deposit into two certificates Wilson told Bozian "that *Page 439 
[Wilson] had made arrangements for [Bozian] to get more money in [Bozian's] account," and that in January 2001, the year of her death, Wilson told Bozian "that she had greatly increased the benefit — the value of [Bozian's] account because she was able to get a high interest rate."
Applying the above principles of law relating to ademption and the general principles of law relating to the construction and interpretation of wills, we affirm the judgment of the trial court.
This opinion was prepared by retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
MOORE, C.J., and HOUSTON, LYONS, JOHNSTONE, and WOODALL, JJ., concur.
[1] The testatrix spelled Marguerite W. Bozian's last name as "Bazian" in her will, but no issue is made that Marguerite W. Bozian is not the legatee named in the will.
[2] Merritt testified as follows about the transaction:
 "Q. So effectively, then, she had — it went from a 6-month lower interest rate to a 24-month higher interest rate with her funds on deposit at the bank?
"A. Right.
 "Q. And it was — was it transferred in the bank's — on the bank's record to do that?
"A. Yes.
 "Q. And were new — well, let me ask you this. It appears it looks like new numbers were assigned to it. Why were new numbers assigned —
"A. Because the term changed.
 "Q. Okay. And was that for the bank's convenience or for a banking notation?
"A. That's just our system. Since the term changed.
 "Q. And is it — my question is, is it the same money that had always been in the bank, though?
"A. Yes.
"Q. No doubt about that?
"A. No doubt.
 "Q. And so the $99,000 value went to a 7 percent and was divided — it looks like into — I don't have that in front of me — $49,000 and some odd dollars each?
"A. Right."
(Emphasis added.) On cross-examination by Parker's counsel, Merritt testified as follows:
 "Q. Now, she did not keep the same term, and she changed and created two separate CD's, so she did not roll over that money into another account; is that right?
"A. Yeah. She changed the term is what she did —
"Q. And she created two separate CD's?
"A. Which made us assign her a different number.
 "Q. And she did that — that's something you had to do? You had to assign different numbers at the time that you created — at the time she created the two separate accounts; is that right?
"A. Yes.
 "Q. And there was no rollover, she actually had to stop one C.D. and open up two different ones; is that right?
"A. Well, we — we did the interest to do that, yes.
 "Q. Yes, ma'am. So there was actually a complete cessation of C.D. 1274; is that right?
"A. I'm sorry. What did you say?
 "Q. C.D. 1274, it ended on March 16, 2000; is that correct?
"A. That's when we changed it over and split it, yes.
 "Q. Yes, ma'am. And you split it at her direction; is that right?
"A. Right.
 "Q. That's not something the bank did automatically; it's not something the bank did on its own?
"A. Right.
 "Q. So there was in fact no rollover of existing funds? There was actually a C.D. that was cashed and two new CD's opened; is that right?
"A. Well, we didn't actually cash them —
"Q. The bank made a transfer?
"A. Right. We transferred it.
". . . .
 "Q. And she could have kept C.D. 1274 had she so chosen; is that right?
"A. Not to get the 24-month term.
 "Q. Not to get the 24-month term. But also if she had wanted to split the money, she would have had to create another CD; is that right?
 "A. To split — yes. At any time she split it, she would have also had to change the number."
[3] Parker testified at trial as follows:
 "Q. And it's your position that the C.D. Ms. Bozian received was not rolled over to another account?
"A. Right.
 "Q. And I asked you, is it your position that the C.D. that was given to Ms. Bozian was not transferred in whole to another account?
"A. Right.
 "Q. And your answer was right then. Okay. And was it your position that the fund of money sitting in that C.D. at the First Bank of Dothan was not transferred to another account at the First Bank of Dothan?
"A. Right.
"Q. And your answer was, no, it was closed out?
"A. Well, it was.
 "Q. And it was not transferred to another account at the First Bank of Dothan? That's still your belief?
"A. Yes, sir.
 "Q. And is it your belief that your mother [Wilson] closed out this C.D. at First Bank and didn't roll that money over or transfer that money to another account at the First Bank of Dothan; is that your belief?
"A. Yes, sir.
"Q. And your answer was yes?
"A. Uh-huh.
 "Q. And that's why you believe Ms. Marguerite is not supposed to get the CD. And your answer was right?
"A. (Witness nodded.)
"Q. Is that still your testimony here today?
"A. Yes, sir."
[4] The record shows that Parker called Wilson "Momma" and that she went to live with the Wilsons when she was five years old. She lived with them until she was 19, when she got married.
Bozian also had a close relationship with the Wilsons. She said that she lived with them for a time during the depression, and that she spent almost every summer with them until she was about 14. During the 10 to 15 years before Wilson's death, Bozian lived in Ohio, but she testified that she returned to Alabama on numerous occasions to visit with Wilson and that when she visited she did some house repairs and made purchases for Wilson. She testified that she visited with Wilson twice a year and telephoned her two or three times a month and that she hired people to take care of Wilson.
[5] Bozian, upon questioning by her counsel, testified, in part, as follows:
 "Q. . . . I want to bring us on up, now, to the mid-90s, and let's get closer to the time — when did Ms. Effie [Wilson] die?
"A. She died in April.
"Q. 2001?
"A. 2001.
 "Q. And in the 5 or 10 year period before that, I want to center into that. Were you still coming to visit her?
"A. At least twice a year.
"Q. And were your visits pleasant?
"A. Oh, yes.
"Q. Enjoyable?
"A. Yes.
 "Q. Did there [come] an occasion in the mid-90s when you became aware that you were going to be a beneficiary of her will?
"A. Yes.
 "Q. And were you aware — become aware of what that benefit would be?
 "A. I didn't know amounts, but I knew that she said, and I quote, `I've taken care of you.'
"Q. And do you remember when this was?
 "A. Well, this was in the summer after the will was made in April.
"Q. How do you know that? Did you ever see the will?
 "A. No. But she told me — oh, yes, I saw the will. Of course. But she had told me prior to that that she had — that Sara [Parker] had taken her and she had made out a will.
 "Q. Did you ever hear anything else about the will or any of the money she left to you again before Ms. Effie [Wilson] died?
 "A. Yes. On two occasions. I was talking to her in October —
"Q. Now, October of what?
 "A. Let's see. 2000. It was the October before she died. I was talking to her, and I asked her if she — you know, how everything was going about — we kidded each other about her CD's. And she said that she had made arrangements for me to get more money in my account. And then in January — about the third week in January when I was visiting —
"Q. Wait. Wait. Let's be sure what year. January when?
 "A. Of the year she died. She told me that she had greatly increased the benefit — the value of my account because she was able to get a high interest rate.
 "Q. Marguerite, do you know of any — was there ever any animosity or problems between you and Effie up until her death?
 "A. You know, I racked my brains. And at no point did we ever have an argument, even as a child. I mean, Uncle Rosco would scream at me a little bit. But it was to Aunt Effie I ran, you know. If I cut a finger, I ran to Aunt Effie. I mean — yes.
 "Q. Did she ever give you any indication or did you ever hear any reason to suspect that she might want to cut you out of her will or out of her life in any manner?
"A. None whatsoever."
[6] Parker testified on cross-examination as follows:
 "Q. Are you aware that either you — if it was either you or your husband offer [sic] to carry Ms. Effie [Wilson] to the lawyer to change the will if she wanted to?
"A. Whatever she needed to do.
"Q. And y'all offered to do that, did you not?
"A. Yes, sir.
"Q. And that was after March of 2000, was it not?
"A. Uh-huh."